# TANDY CORPORATION, et al. *v.* Johnny Dale BONE

84-91 678 S.W.2d 312

Supreme Court of Arkansas
Opinion delivered October 22, 1984
[Rehearing denied December 3, 1984.]

400

*Wright, Lindsey & Jennings,* for appellant.

*R. David Lewis,* for appellee.

DARRELL HICKMAN, Justice. Johnny Dale Bone, manager of a Radio Shack store in Little Rock, Arkansas, was fired or quit as a result of an investigation of irregularities in the operation of his store. Bone sued his employer alleging intentional infliction of mental distress as a result of the investigation. He also claimed that he was later slandered by another employee. The jury returned a verdict against Tandy Corporation, the parent company of Radio Shack, for $5,000 for slander, $9,000 for infliction of emotional distress and $100,000 in punitive damages. Tandy appeals and Bone cross-appeals.

The appellants raise seven points on appeal, two of which are meritorious and require us to reverse the judgment and remand the case for a new trial. The appellee raises five questions on cross-appeal, one of which has merit.

Over the objection of the appellants, the court gave AMI 2217, a standard jury instruction, which concerns punitive damages. We held in *Ford Motor Credit Co.* v. *Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979), that this instruction was designed to be used in cases of neligence, not in cases such as this one which involve an intentional tort. Just as we did in *Ford Motor Credit Co., supra,* we reverse and remand the case for a new trial because of this error.

The appellee argues that the appellants did not make a proper objection to this instruction because no instruction was proffered in substitution. There is no such requirement. All that is required to preserve an objection for appeal regarding an erroneous instruction of law is to make a timely objection and state valid reasons for the objection. ARCP Rule 51. The appellants did both.

The trial court was also wrong in commenting on the weight to be given certain evidence offered by the appellants in the form of computer printouts. The court stated that the evidence was double hearsay and "terribly, terribly suspect." When the appellants moved for a mistrial, the court gave a mild admonition to the jury to disregard the court's remark. The Arkansas Constitution prohibits trial judges from commenting to the jury regarding matters of fact which are within the province of the jury. Art. 7 § 23 Ark. Const. (1874). The admonition given the jury by the court is as follows:

> Ladies and Gentlemen, they are scolding me because I'm talking about the legal significance of it. You ladies and gentlemen don't pay any attention to what the court says about this. It's just a legal question. You don't let that influence you in your weighing of the evidence which you are receiving.

That admonition could not cure the remarks by the trial

court whose words and opinions are undoubtedly given a good deal of weight by a jury.

At the request of the appellants, the court instructed the jury that statements, although slanderous, may be privileged when made without malice, in good faith, and relate to a subject bearing upon the employment relationship. There was no basis for giving this instruction. The alleged statement in this case was made by an employee to a customer who inquired of Bone's whereabouts. In essence the statement was that Bone had been fired for stealing. The jury had no circumstance before it which would give rise to the defense of privilege. See *Dillard Dept. Stores, Inc.,* v. *Felton,* 276 Ark. 304, 634 S.W.2d 135 (1982).

Aside from these questions and other questions which we must discuss, the most difficult question before us is Bone's main cause of action which he describes as the intentional infliction of mental distress and which we have called the tort of extreme outrage. The appellants argue that there is no substantial evidence that would support a finding of intentional infliction of mental distress or extreme outrage and request that the judgment be reversed and dismissed. In reviewing this question on appeal, we must examine the evidence in the light most favorable to the appellee, who, in this case, is Johnny Dale Bone. We affirm if there is any substantial evidence to support the finding of the jury. *Taylor* v. *Terry,* 279 Ark. 97, 649 S.W.2d 392 (1983). We find there was in this case as we will explain.

We first examined the question of outrage in *M.B.M. Co.* v. *Counce,* 286 Ark. 269, 596 S.W.2d 681 (1980), where we said:

> . . . .[O]ne who by extreme and outrageous conduct wilfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.
>
> . . . .
>
> By extreme and outrageous conduct, we mean

conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. See Restatement of the Law, Torts, 2d 72, § 46, Comment d.

In *Givens* v. *Hixson,* 275 Ark. 370, 631 S.W.2d 263 (1982), we found no outrageous conduct and emphasized the conduct complained of must be both extreme *and* outrageous. We said:

The new and still developing tort of outrage is not easily established. *It requires clear-cut proof.* 'Liability has been found *only* where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' (Italics supplied.)

In two cases we have held that a case was made for the jury of extreme outrage. In *M.B.M. Co.* v. *Counce, supra,* an employee was suspected of stealing but was told she was being laid off because of too many employees. She was later told she must submit to a polygraph test before she would receive her last paycheck. Although she passed the test, $36 was deducted from her final paycheck as her share of the missing money. She was denied unemployment benefits due to the reasons given by her employer for her dismissal. In a more recent case, the owner of a cemetery that held itself out as supplying perpetual care, caused exposure of vaults by excavation work and travel across the graves, all with such callous disregard that it was found to be outrageous conduct. *Growth Properties I* v. *Cannon,* 282 Ark. 472, 669 S.W.2d 447 (1984).

Not all courts are in agreement about the tort of outrage and how to treat it. As stated in 38 Am. Jur. 2d, *Fright, Shock, and Mental Disturbance,* § 13:

In respect of the right to maintain an action for a bodily injury or illness resulting from a mental or emotional disturbance, the authorities are in a state of

dissension probably unequaled in the law of torts.

We have taken a somewhat strict approach to this cause of action. Recognition of this new tort should not and does not open the doors of the courts to every slight insult or indignity one must endure in life. For example, abrasive profanity alone is not sufficient reason to have a cause of action. W. Prosser, *The Law of Torts*, § 12 (4th Ed. 1971); see also *Brooker* v. *Silverthorne*, 111 S.C. 553, 99 S.E. 350 (1919); *Food Fair, Inc.* v. *Anderson*, 382 So. 2d 150 (Fla. Dist. Ct. App. 1980). But see *Curnett* v. *Wolf*, 244 Iowa 683, 57 N.W.2d 915 (1953) and 15 ALR2d 108 (1951).

The relevant facts are as follows. Johnny Dale Bone was hired in early 1983 as the manager of a Radio Shack store in Little Rock, Arkansas. Brooks Robbins was his assistant. Bone said he suspected that Robbins was stealing, but felt he could not prove it. He did send a memorandum to his superior regarding the unsatisfactory conduct of his employee. Bone was informed on two occasions by his supervisor that certain practices in the store were not satisfactory. On August 13, 1983, his supervisor, Mr. Max Griswold, and two security people came to the store at 9:30 a.m. to conduct an investigation. Bone and Robbins knew the investigation was going to be made. They were questioned at thirty minute intervals during the day. According to Bone, the security men cursed him, threatened him, and refused on two occasions during the questioning to allow him to take medication. Bone said, however, he was not touched by the security people. Brooks Robbins testified that he admitted to the investigators he was guilty of theft and was fired on the spot. That afternoon, about 3:30 p.m. after the questioning, Bone was asked to take a polygraph examination and he consented. However, he was in a highly agitated condition and he said he again requested that he be allowed to take his medication, which was a tranquilizer. It is conceded he was denied the request because it might affect the outcome of the test. Bone was taken to another location in Little Rock to take the test, but he hyperventilated. Paramedics were called. Bone recovered sufficiently to be taken home by Griswold. He returned to work the next day but could not continue. He called a psychiatrist for help and was eventually

hospitalized on August 23. He remained in the hospital about a week and never returned to work. Bone's attorney wrote the appellants in August informing them that suit would be filed. The appellants offered testimony that Bone was terminated because he failed to return from medical leave.

According to the evidence, Bone had been taking Valium for at least three years and had a prescription for it from a psychiatrist. The psychiatrist, who treated Bone for the hyperventilation and anxiety, testified that Bone suffered from a personality disorder which made him more susceptible to stress and fear than someone who did not have the personality disorder. He said that Bone had paranoid trends and episodes in which he is nearly, but not completely, psychotic and unable to function effectively with other people socially. He said that Bone had a low tolerance for frustration. Bone had first sought the services of a psychiatrist when he was in a federal penitentiary in 1979.

The appellants' evidence was contradictory: Bone was not cursed or called names during the questioning. One of the officers testified that the questioning began about noon and he did not know Bone took Valium until they were leaving to take the polygraph test and Bone then requested it. Bone told him then that he took it in the evening to relax. He told Bone it would be best if he could do without it because it would affect the polygraph test and Bone agreed.

Bone's suit was based on the fact that he was interrogated most of the day at 30 minute intervals, alternating between him and his assistant without a break for lunch, he was denied his Valium or medication when he was obviously under emotional stress, and the interrogators cursed him, accused him of stealing and threatened to have him arrested.

Was the employer's conduct extremely outrageous? Bone knew that he was going to be interrogated about the operations of the store before the security men arrived.

There were serious deficiencies in the operation of the store. Bone knew that he was responsible for the operation of the store and would have to account for any discrepancies. Furthermore, Bone did not object to the polygraph examination and, in fact, agreed to take it. He returned to work the next day and stated that he still wanted to take the polygraph examination. The fact that he was questioned, the way he was questioned and requested to take a polygraph examination would not be outrageous conduct on the part of an employer investigating possible theft, serious inventory shortages, and unacceptable business practices as the employer had evidence of here.[1] The conduct on the part of the employer that does give us difficulty is the undisputed evidence that Bone was obviously undergoing a good deal of stress, requested his Valium or medication, and was denied that privilege. The employer was on notice at that point that Bone may not have been a person of ordinary temperament, able to endure a stressful situation such as he was placed in without injury.

In *Givens* v. *Hixon, supra,* we noted that the defendant knew nothing about the plaintiff's heart condition or the fact he was easily upset. Also, in the case of *M.B.M. Co.* v. *Counce, supra,* we adopted the standard that "[t]he emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it." See also Prosser, *supra,* p. 50.

If the employer in this case had been completely ignorant of Bone's condition, it may be that Bone would not have a case of extreme outrage. However, the employer was not completely ignorant of Bone's temperament nor for that matter diligent in learning about Bone's background. The employer discovered shortly after Bone was

---

[1] For example, Bone had difficulty explaining the sale to a customer of a piece of merchandise which involved a check made payable directly to him which noted it was in "repayment of a loan." Bone testified that the equipment was his and not the property of Radio Shack, but he could not explain why the notation was made on the check. Bone said he denied throughout the investigation that he was guilty of any theft or committed any intentional dishonest act.

employed that he had lied on his application about his criminal record and had been convicted of a felony. His supervisor did not bother to find out what the conviction was for. The supervisor said that if he had learned that it was for selling heroin he would have terminated Bone. He could have easily discovered this information and perhaps more about Bone's background.

More importantly, we have to take Bone's testimony at its face value in examining the legal question before us. Bone said that on at least three occasions during the day he requested that he be permitted to take his medication. At one time he said he reached for a drawer to get it and the drawer was slammed shut by one of the investigators. He said that before he went to take the polygraph test he was "begging" to take it. His supervisor admitted that Bone requested that he be allowed to take his Valium before the polygraph test was to be administered. One of the investigators testified that he intended to place Bone and the other employee in a somewhat stressful situation. So we do not have a situation of an employee of ordinary emotional stamina, and we do not have a situation in which the employer was totally ignorant of the physical or emotional condition of the appellee as was in *Givens* v. *Hixon, supra*. It was for the jury to decide whether under the circumstances it was outrageous conduct for the employer to deny Bone his medication and to continue to pursue the investigation knowing Bone was on medication or Valium. We emphasize that the notice to the employer of Bone's condition is the only basis for a jury question of extreme outrage. Whether Bone's testimony was credible, whether he had intentionally lied to his employer[2],

---

[2] The evidence revealed that Bone had lied to his employer in several instances. On his employment application form, he marked "No" in answer to whether he had been convicted of a felony. In fact, he had been convicted of distributing heroin and sentenced to the federal penitentiary. He marked that he was a high school graduate when actually he had only completed the ninth grade. He explained that he had a graduate equivalency diploma and thought that the question permitted the answer he gave. He conceded that he lied when he noted that he had completed one year of college. He had not. His employer did not know that he had been under medication or taking Valium for at least three years. Bone testified that he was not asked at the time of his employment if he had ever been treated by a psychiatrist.

whether the employer was reasonable in denying him his medication, and whether, considering all the circumstances, the employer was guilty of outrageous conduct that proximately caused emotional distress to Bone were all questions for the jury. Because of the evidence we have outlined, there would be substantial evidence to support a verdict for outrage.

The jury also found that Bone had been slandered when an employee of Radio Shack told a customer that Bone had been fired for stealing. The appellants argue on appeal that there was insufficient evidence of slander. We do not agree. A customer testified an employee, he assumed to be the manager, told him the former manager had been fired for stealing. Two other witnesses testified an employee told them that Bone was fired for reasons that he did not "want to get into right now." All inferences must be taken in the light most favorable to the appellee and from this evidence the jury could easily have found slander. See *Arkansas Ass. Telephone Co.* v. *Blankenship*, 211 Ark. 645, 201 S.W.2d 1019 (1947).

The appellants argue that the trial court erred in refusing to give an instruction that the jury could take into account Bone's lack of good character and reputation in assessing any damage to his reputation. This argument was made based on the evidence of Bone's conviction in federal court. Bone admitted the conviction during direct examination. This is not evidence of Bone's reputation. Specific instances of wrongdoing are not reputation for bad character or opinion evidence that is contemplated by such an instruction. See 2 D. W. Louisell and C. B. Mueller, *Federal Evidence* § 143 (1978).

Appellants argue that it was wrong to allow Bone to deny that he was actually guilty of a crime for which he had been convicted. A witness cannot offer evidence which would amount to a retrial of that prior conviction. *Jones* v. *State*, 277 Ark. 345, 641 S.W.2d 717 (1982). Bone should not have been allowed to try to demonstrate his innocence, but this is an issue of relevancy and the trial judge is permitted a wide range of discretion. *Jones* v. *State, supra.*

Another point raised by appellant concerns hearsay. Bone testified that at one point he had been told by his probation officer to put "no" if he were asked on an employment form whether he had been convicted of a felony. The objection was properly overruled. This is not an example of hearsay since Bone was not offering the statement to prove whether the probation officer so directed him but instead he was offering it to prove his motive in so filling out the form. This was also a discretionary ruling.

On cross-appeal Bone argues that the trial court erred in not entering the rate of interest on the judgment, which he contends should have been ten percent from the date of the judgment, according to Ark. Stat. Ann. § 29-124 (Repl. 1979). This is a matter which can be corrected upon retrial.

Bone argues that the trial court erred in permitting introduction of the appellee's employment application and cross-examination regarding his prior employment history because they were irrelevant. Bone admitted he lied on the employment form and, therefore, the trial judge did not abuse his discretion in admitting the form.

Bone also argues that the court erred in refusing to direct a verdict for him on the appellants' counter-claim for $28,000 in inventory losses. No motion for a directed verdict appears in the record. Bone (cross-appellant) therefore cannot raise the court's failure to grant it. As part of this point Bone also argues it was error for the court to instruct the jury that Bone owed appellants a fiduciary duty. There was no error since Bone was the appellants' employee and agent in this case, as manager of their store, and, thus, owed them a fiduciary duty. See H. Resuchlein and W. Gregory, *Handbook of the Law of Agency and Partnership*, §§ 4, 67 (1979); Restatement (Second) *Agency* § 220 (1958); 53 Am. Jur. 2d *Master and Servant* § 97 (1953). Bone argues that his employment contract controls any duty he owed and that it provides that an employee will be liable for losses due only to gross negligence or dishonesty. The contract contains no such

limitation; it merely recites that if there are losses occasioned by the dishonesty or gross negligence of the employee, then the employer has the right to deduct the losses from the employee's wages.

The final issue, raised on cross-appeal, involves records. Immediately after this incident, the appellants conducted an inventory by computer and offered into evidence the results of computation in the form of certain printouts. An objection was made that these printouts were hearsay. Bone here argues they were prepared after notice of suit and for the purposes of testimony at trial and could not be admissible under Rules of Evidence 803 (6). The trial court, in its discretion, allowed the printouts to be admitted, and we cannot say the decision was clearly wrong.

The appellee also argues that the appeal should be dismissed because of violation of Supreme Court Rule 9. We find no such violation.

The case is remanded for a new trial.

Reversed and remanded.