William L. INGRAM *v.* PIRELLI CABLE CORPORATION

87-280                                     747 S.W.2d 103

Supreme Court of Arkansas
Opinion delivered March 28, 1988

*Q. Byrum Hurst, Jr.*, for appellant.

*Wright, Lindsey & Jennings*, for appellee.

TOM GLAZE, Justice. This case presents questions regarding the action of tort of outrage. Specifically, we are asked whether the trial court erred in directing a verdict in favor of the appellee, the appellant's employer. The court found that the evidence was

insufficient to show appellee's conduct (or that of its agents) rose to the level required to establish an action for tort of outrage or intentional infliction of emotional distress. In viewing the evidence in the light most favorable to the appellant and giving it its highest probative value, we conclude the trial court was correct. Therefore, we affirm.

In March 1980, appellant went to work for appellee as an electrical department manager at a salary of $22,000.00 per year. His employment relationship with appellee could be characterized as good for about three years, having received a promotion to project engineer and an increase in salary sometime in 1982. Appellant's problems apparently commenced in November 1983, when Mr. Garibay became plant manager. At this time, appellant's immediate supervisor, Mr. Brennesholtz, informed appellant that the electricians and mechanics whom appellant supervised were no longer allowed to go to the maintenance department where they picked up their new job assignments from appellant. Appellant complained to Brennesholtz that this new policy crippled the operation because appellant had to anticipate when each worker would complete his job and go to him to assign another job. About a month later, Brennesholtz placed some of appellant's workers, the mechanics, under Mr. Gary Meeks, another department head. Mr. Meeks and other management level employees, apparently were allowed to use telephones to page and manage their workers when making job reassignments. Appellant stated that Garibay had put this telephone policy in effect after appellant returned from performing an engineering project in Abbeyvale, South Carolina, where appellee had another plant; appellant believed Garibay imposed the policy to harrass him, but conceded that he had never spoken with Garibay to determine the reasons the policy was formulated.

During the next ten months, matters grew worse for the appellant. In January 1984, Brennesholtz told appellant and Mr. Meeks to stay an extra hour each day so they could coordinate work, but because no one attended the meetings except appellant, he stopped going. Another problem arose in February 1984, when a machine in the plant broke down and Brennesholtz instructed appellant "to stay all night if necessary to get this machine running." Appellant refused saying, "I physically couldn't do it and to back off me." Appellant returned to work the next day and

apparently nothing else was said about that confrontation. Next, in March 1984, appellant was told he was to pick up any messages at the switchboard within five minutes of when they came in and to deliver them to his workers within five minutes. No other department manager was asked to handle messages. And finally, in August 1984, Brennesholtz requested appellant to sign a job description as electrical department manager, and the appellant refused, explaining he was the project engineer. Appellant then asked to see the job description for plant engineer, but Brennesholtz would not respond. Although appellee considered appellant's position to have reverted to electrical department manager, appellant never received a decrease in pay.

Two other employees for appellee testified, indicating they had knowledge that Garibay and Brennesholtz were putting pressure on appellant. One of the two employees said Brennesholtz voiced concern that appellant might sue appellee if the pressure continued. In October 1984, appellee had a reduction in work force due to economic conditions, and appellant was laid off with others. The plant facility was closed altogether in March 1985, and when notified of the opportunity to discuss employment opportunities at other appellee locations, appellant did not respond.

The foregoing evidence reflects a serious conflict or dispute between appellant and his supervisors, and while we believe the supervisors' conduct was petty, insulting and less than one might expect from manager level executives of a reputable firm, we cannot agree such conduct was outrageous. In *M.B.M. Co.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980), we first recognized this new tort of outrage or intentional infliction of emotional distress and defined extreme and outrageous conduct as meaning conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

The *Counce* case, like the one here, involved the discharge of an employee; but the court rejected any suggestion that Ms. Counce's discharge, itself, supported an action for intentional infliction of emotional distress. The court further recognized that her employer was not liable for doing that which it had the legal

right to do, *viz.*, the employer had the right to terminate her. *Id.;* *see also* Restatement (Second) of Torts § 46, at 76 comment g (1965). *Cf. Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982) (wherein the employer angrily accused his employee of not working and terminated the employee causing him to lose sleep and weight and to enter the hospital). The *Counce* court, instead, looked to the employer's conduct that occurred subsequent to Counce's discharge, and found that such conduct clearly presented a material issue of fact as to whether the employer's conduct was extreme and outrageous. That conduct included the employer's suspecting Ms. Counce of theft, forcing her to take a polygraph test by withholding her pay after she was discharged, continuing to keep her wages after she passed the test and causing her, without a satisfactory basis or reason, to lose her unemployment benefits.

■ In the instant case, we are faced with an employee who was first laid off and then discharged, which the appellee had a legal right to do. In addition, it is clear the appellee's supervisors had the authority to establish policies and procedures, and while some of those policies or procedures may have appeared demeaning or insulting to an employee, such conduct by an employer is not the type that gives rise to the level of being outrageous. In other words, liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Restatement (Second) of Torts § 46 comment d (1965).

We said as much in *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984), wherein we stated that our recognition of this new tort should not and does not open the doors of the courts to every slight insult or indignity one must endure in life. There, we clearly stated that the court had taken a somewhat strict approach to this cause of action.

■ The facts in *Bone* were similar to those in *Counce*, except the outrageous conduct giving rise to the employee's cause of action occurred immediately before his discharge. In sum, Bone's suit was based on the fact that he was accused of a theft, threatened with arrest and interrogated by company investigators who cursed him and admitted placing him under stress. However, we emphasized that even this conduct would not be outrageous, except the employer knew Bone was under extreme

emotional stress at the time; even so, the employer still denied Bone the prescription medicine that he required. One investigator, in fact, slammed a drawer when Bone reached to get his prescription. Based on these facts, we held the evidence was sufficient to support a verdict for outrage. Our holding in *Bone* is consistent with the view that the extreme and outrageous character of the conduct may arise from the actor's (employer's) knowledge that the other (employee) is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. Restatement (Second) of Torts § 46 comment f (1965).

Thus, the court in *Bone* recognized the principle announced in *Counce*, that an employer has the legal right to discharge an employee who is terminable at will; but, even so, the court contemporaneously sensitized the employer and tempered the employer's conduct in such matters when that employer possesses knowledge that the employee is peculiarly susceptible to emotional distress, whether from physical or mental origin.

From the record before us, we find nothing that reflects the appellee or its supervisors, Garibay or Brennesholtz, had knowledge that appellant was peculiarly susceptible of emotional stress. Appellant's own psychologist, who examined and tested him months after he left appellee's employment, testified that appellant revealed no identifiable mental, emotional or behavioral disorder.[1] Although appellant and his wife related that he had experienced stress, chest pains and sleepless nights when dealing with the pressures foisted upon him by his supervisors, there is nothing in the record that shows he informed appellee of these stress-related problems. Even if he had, we doubt that, under the circumstances of this case, the appellee's conduct could be described as outrageous.

In conclusion, we mention our most recent case of *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988),

---

[1] The psychologist did testify that, by evaluating appellant's job and medical history and through other quantitative analyses, he was of the opinion that appellant had been under considerable stress from his job during 1983 and 1984.

which was decided after the parties herein filed their briefs. We need not discuss the facts in detail but do note that the circumstances favoring the employee's outrage claim there were much stronger than those imposed here. Nonetheless, we rejected the employee's claim, holding the employer's conduct failed to support a verdict for outrage. That conduct involved the employer's officers putting pressure on the employee which eventually led to his demotion and decision to leave his employment. Apparently, believing the employee reported the company for pricing violations, the officers took actions designed to set up the employee in order to terminate him.

In *Oxford*, we made it clear that an employer's conduct must be sufficiently egregious or extreme before the standard is met for an outrage cause of action. Obviously, the type conduct that meets that standard, first announced in *Counce* in 1980, must necessarily be decided on a case-by-case basis. While the court has taken a strict view in recognizing an outrage claim, especially in employment relationship situations, we also have said that an employer should not have an absolute and unfettered right to terminate an employee. Accordingly, we held in *Oxford* that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state.

In the instant case, we need only address the issue as to whether the appellee's conduct was outrageous since no wrongful discharge claim is before us. Thus, because we find no merit in appellant's claim for outrage, we affirm.

PURTLE and DUDLEY, JJ., dissent.

ROBERT H. DUDLEY, Justice, dissenting. The trial court directed a verdict against the plaintiff-employee, ruling that the conduct of the defendant-employer (a) was not sufficiently egregious to constitute the tort of outrage, and (b) that the appellant did not suffer severe emotional distress. The majority affirms on both points. I dissent on both points.

The rules of appellate review are very important in this case. The first of those rules is that in reviewing the granting of a directed verdict we are required to examine the evidence, including all reasonable inferences, in a light most favorable to the non-

moving party. *Stalter* v. *Coca-Cola Bottling Co.*, 282 Ark. 443, 445, 669 S.W.2d 460, 462 (1984). Sometimes we state the rule as "on appeal the evidence of the party against whom a motion for a directed verdict is granted will be given its highest and strongest probative value, with all reasonable inferences allowable." *Nunley* v. *Orrell*, 282 Ark. 593, 593, 670 S.W.2d 425, 425 (1984).

In reviewing the evidence with the above rule of review in mind, it becomes clear that six key facts were developed: (1) In March, 1980, the appellee hired appellant as a manager of the electrical department of the Pirelli Cable Corporation's Hot Springs factory. In March, 1982, he was promoted to project engineer for the factory. (2) Although the plant building was one-quarter of a mile long and covered three levels, he was required in 1983 to give out work assignments in the presence of his employees. Unlike the other supervisory personnel, he was not allowed to give out the assignments by telephone or to have the crews report to his office. (3) In January, 1984, he was told by his supervisor that he had to work 10 hours a day, seven days a week, and that the purpose was *harassment*. For the next few weeks he was required to attend a "meeting" during the tenth hour of each day. No one else would be at the "meeting," but he was required to stay there for the full hour. He was again told this was for the purpose of harassment. (4) In February, 1984, a machine in the factory sat in an inoperable condition, and there were no parts available to fix it. He was ordered to stay at the factory all night and fix the machine. (5) In the final act of harassment he was asked by his supervisor to sign a statement which provided that his position was lower than it was. (6) Throughout the year and one-half of harassment, he suffered from emotional distress and, as a direct result, had various problems such as chest pains and insomnia.

The next applicable rule of appellate review which must be considered is the rule which provides that if the above stated facts constitute substantial evidence of the tort of outrage, then it was error to take the case from the jury. *Ikani* v. *Bennett*, 284 Ark. 409, 410, 682 S.W.2d 747, 748 (1985). Accordingly, we must next examine our cases to determine whether these facts fit within the tort of outrage.

We first recognized the tort of outrage in *M.B.M. Co.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). We said, "[W]e can and do now recognize that one who by extreme and outrageous conduct wilfully and wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress." *Id.* at 280, 596 S.W.2d at 687. However, we took care to note that to be tortious a high level of outrageousness is required: "By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.*

In *Counce*, the plaintiff was fired and the employer deducted $36.00 from her final paycheck to cover missing money, despite the fact that the plaintiff denied stealing the money and was shown to be telling the truth by a polygraph machine. In a proceeding comparable to the case at bar, we reversed the lower court's summary judgment against the plaintiff, holding, "We have no hesitation in saying there was a material issue of fact as to whether [the employer's] conduct was extreme and outrageous." *Id.* at 281, 596 S.W.2d at 688.

The facts of this case, when viewed most favorably to the appellant, show extreme harassment pursued over the period of a year and one-half. That is more egregious than was the simple withholding of $36.00 in the *Counce* case. Since we held there was a material issue of fact as to whether the employer's conduct was extreme and outrageous in the *Counce* case, and since this case is even more egregious, we should hold there is a material issue of fact in this case.

Next, the facts, as tested under the rules of appellate review, establish that the appellant felt humiliated, suffered from stress, and, as a result, had physical problems such as chest pain and insomnia. Thus, there was sufficient testimony to avoid a directed verdict on the issue of emotional distress because the motion should be granted only when the proof would not support a verdict. *Nunley* v. *Orrell*, 282 Ark. 593, 670 S.W.2d 425 (1984).

PURTLE, J., joins in this dissent.