Wendell CROOM *v.* Kathie YOUNTS, Individually and as Parent and Next Friend of Rachel Younts, a Minor

95-814 913 S.W.2d 283

Supreme Court of Arkansas
Opinion delivered January 16, 1996

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *John E. Moore* and *Julia L. Busfield*; and *Crockett & Brown*, by: *R.J. Brown*, for appellant.

*Dodds, Kidd, Ryan & Moore*, by: *Greg Alagood*, for appellee.

ROBERT L. BROWN, Justice. The appellant in this case, Wendell Croom, urges two points in his appeal: (1) evidence of the tort of outrage was insufficient, and (2) the trial court erred in instructing the jury. We agree with the appellee, Kathie Younts, on both points and affirm the judgment.

Kathie Younts is the mother of Rachel Younts, who at the time of the events in question in 1993, was age 15. (Rachel Younts's date of birth was October 2, 1977.) Younts is also the first cousin of Wendell Croom, who in the summer of 1992 lost his wife to cancer. During the time of the events leading to this litigation, Croom was 51. In January of 1993, Younts planned to go to Hawaii and visit a man whom she was engaged to marry. She needed someone to watch over her daughter Rachel and her younger daughter, Katie, while she was away. Croom first volunteered to do this but then attempted to renege the day before she left on the basis that he was inclined to drink alcoholic beverages and something might happen to the girls or someone might make an insinuation about the appearance of Younts's daughters staying in his home. Younts implored him to reconsider which he did, and she left for her visit to Hawaii which was to last from January 6, 1993, to January 16, 1993.

While in Hawaii, Younts telephoned home on a daily basis but noticed that towards the end of her trip Rachel had been reluctant to come to the phone. When Younts returned, she observed that her children had become very attached to Croom, especially Rachel. Croom would call regularly and invite the girls over. Though Younts would refuse Croom's offer to drive Rachel home from her school, Croom would on occasion pick her up anyway. Younts initially attributed this to Croom's loneliness and lack of social friends. She urged Croom to stop intruding in her daughter's life with offers of transportation and dinners, but Croom persisted.

The matter came to a head when Croom asked Younts if he could take Rachel to visit his wife's and father's graves. She balked at the invitation but eventually relented on the condition that Rachel would be home for church services at 5:00 p.m. Croom did not meet the deadline but rather called about 7:00 p.m. and told Younts that he and Rachel were having dinner at a restaurant. She demanded that Croom bring Rachel home, and he responded, according to Younts: "I'm getting sick and tired of you telling Rachel what to do. She's a grown woman, I'm a grown man and to hell with you." Croom brought Rachel home at midnight. There was a confrontation between Younts and Croom at that time, during which Croom expressed his love for Rachel. He refused to leave until he found out what punishment

Younts was going to mete out to Rachel. Younts finally got a knife from the kitchen and threatened Croom with it, and he left. Younts then told her daughter that she was not to see Croom again, and later that night, Rachel attempted suicide by ingesting her brother's asthma medicine. She was taken to Children's Hospital and admitted on March 8, 1993. On the night of admission, Croom showed up at Children's Hospital intoxicated, accused Younts of precipitating the suicide attempt, and professed that he was the only one who truly cared for Rachel. He had to be escorted from the hospital by security personnel.

At the hospital, Rachel initially denied that she had had a sexual relationship with Croom but then admitted it to a staff social worker on April 4, 1993. She stated that it began while her mother was in Hawaii and that Croom had forced sexual activity upon her. During the course of Rachel's treatment, she was prescribed the antidepressant medication, Prozac, and on April 14, 1993, she was discharged from the hospital. On June 17, 1993, she was readmitted to Children's Hospital after superficially slashing her wrists. She remained at the hospital until July 6, 1993.

On February 3, 1994, Younts brought suit against Croom and alleged violations of the torts of seduction and outrage. Before the trial, the trial court dismissed the seduction claim. At trial, Rachel explained how her sexual relationship with Croom developed. She testified that Croom had plied her with wine during a cookout with neighbors, and after they had left, he asked her into his bedroom and gave her a prescription medicine, Xanax. He then took her to bed and had sexual relations with her. She testified that following that first experience she had sexual relations with Croom 10 or 15 times. During this period, she described her state of mind as being "mad" and "just chaotic." She added that she was "sad" and "hated" herself. Following the confrontation between her mother and Croom, during which Younts pulled the kitchen knife, Rachel decided to take all of the medicine in the medicine cabinet, including her brother's asthma medication, and "lay down and just go to sleep."

Croom's defense at trial was that he was abusing alcohol daily and that Rachel initiated the sexual contact and told him he would never have to worry about getting into trouble. Before

the relationship with Rachel developed, he testified that he was impotent. He also testified that after she was hospitalized, he sent her dimes, and she called him twice a day. Croom admitted at trial that he had been convicted of sexual misconduct, a class B misdemeanor, for having sexual contact with Rachel but stated that the matter was on appeal to circuit court. He further admitted that he had lied at the criminal proceeding, and in his deposition as well, about not having sex with Rachel. Sue Laneer, a psychotherapist, testified on behalf of Croom and stated that he was experiencing an adjustment disorder at the time of his relationship with Rachel and that this affected his ability to cope and make judgments. This condition, according to Laneer, caused him to "rationalize" his relationship with Rachel on the basis that she was intelligent and mature for her age.

The jury found for Younts on the tort of outrage and awarded her $15,286.96 for Rachel's medical expenses, $60,000 in compensatory damages, and $25,000 in punitive damages. Judgment was entered, and Croom filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial on the basis that the evidence for the tort of outrage was insufficient and that the trial court erroneously instructed the jury on negligent conduct. The motion was denied. Croom appealed, and Younts cross-appealed on the dismissal of her seduction claim. Younts abandoned her cross-appeal in her brief filed in this appeal.

For his first point on appeal, Croom argues that there was no substantial evidence to support Younts's claim of outrage. He concedes that his conduct was wrong, but he vigorously contends that it did not meet the test of outrageous conduct. He specifically urges that he lacked the requisite intent to inflict emotional distress on Rachel.

██ To succeed on a claim of intentional infliction of emotional distress, or outrage, Younts had to prove these elements:

> (1) that the actor intended to inflict emotional distress or wilfully and wantonly knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable

in a civilized community; (3) that the actions of the defendant were the cause of her distress; and (4) that the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Hunt* v. *Riley*, 322 Ark. 453, 909 S.W.2d 329 (1995); *Perrodin* v. *Rooker*, 322 Ark. 117, 908 S.W.2d 85 (1995); *Hollingsworth* v. *First Nat'l Bank and Trust Co.*, 311 Ark. 637, 846 S.W.2d 176 (1993); *Deitsch* v. *Tillery*, 309 Ark. 401, 833 S.W.2d 760 (1992). What constitutes willful or wanton conduct for the tort of outrage is defined under Arkansas Model Instruction 404:

A person acts willfully and wantonly when he knows or should know in the light of surrounding circumstances that his conduct will naturally and probably result in emotional distress [and bodily harm] and continues such conduct in reckless disregard of the consequences.

What constitutes extreme and outrageous conduct is also defined under AMI 404:

By extreme and outrageous conduct, I mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

The jury was instructed on both definitions at the trial of this matter.

■■ In the case before us, Croom appeals based on insufficient evidence to support the judgment and lack of substantial evidence to support the trial court's denial of a motion for a judgment notwithstanding the verdict and new trial. To determine whether sufficient evidence exists to support a judgment in tort-of-outrage cases, we assess whether the evidence is substantial and, in doing so, consider it in the light most favorable to the appellee. *City of Green Forest* v. *Morse*, 316 Ark. 540, 873 S.W.2d 154 (1994); *Tandy Corp.* v. *Bone,* 283 Ark. 399, 678 S.W.2d 312 (1984). Whether there is substantial evidence to support the verdict is also the standard of review for the denial of a motion for a judgment notwithstanding the verdict and new trial. *Scott* v. *McClain*, 296 Ark. 527, 758 S.W.2d 409 (1988);

*Arkansas Power & Light* v. *Adcock,* 281 Ark 104, 661 S.W.2d 392 (1983). Substantial evidence is evidence that is of sufficient certainty and precision to compel a conclusion one way or another, forcing or inducing the mind to pass beyond suspicion or conjecture. *First Marine Ins. Co.* v. *Booth,* 317 Ark. 91, 876 S.W.2d 255 (1994). On review of denial of a motion for new trial, this court gives the verdict the benefit of all reasonable inferences permissible in accordance with the proof. *Gilbert* v. *Shine,* 314 Ark. 486, 863 S.W.2d 314 (1993).

■ This court has repeatedly stated that we require clear-cut proof to establish the elements in tort-of-outrage cases. *Ross* v. *Patterson,* 307 Ark. 68, 817 S.W.2d 418 (1991); *Cordes* v. *Outdoor Living Ctr., Inc.,* 301 Ark. 26, 781 S.W.2d 31 (1989); *Harris* v. *Arkansas Book Co.,* 287 Ark. 353, 700 S.W.2d 41 (1985); *Tandy Corp.* v. *Bone, supra; Givens* v. *Henson,* 275 Ark. 370, 631 S.W.2d 263 (1982). Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Harris* v. *Arkansas Book Co., supra; Hess* v. *Treece,* 286 Ark. 434, 693 S.W.2d 792 (1985). We have also stated that we take a strict approach and give a narrow view to the tort of outrage. *See, e.g., City of Green Forest* v. *Morse, supra; Forrest City Mach. Works* v. *Mosbacher,* 312 Ark. 578, 851 S.W.2d 443 (1993); *Deitsch* v. *Tillery, supra; Ross* v. *Patterson, supra; Tandy Corp.* v. *Bone, supra.* Hence, in considering whether evidence is sufficient in tort-of-outrage cases, we must determine whether it is substantial in light of these standards.

The definition of the tort of outrage includes willful and wanton conduct which embraces activity in which a person knows or should know in light of surrounding circumstances that his actions will naturally and probably result in emotional distress. Thus, whether Croom specifically intended to inflict emotional distress on Rachel is not the sole test. We also consider whether he acted in such a fashion that he should have known under the circumstances that emotional distress to Rachel would be the result of what he did. Assuming that determination is made in favor of Younts, we must then assess whether Croom's conduct was so extreme and outrageous that it exceeded all possible bounds of decency which renders it utterly intolerable in a civilized society.

■ We believe that there was substantial evidence that Croom should have known emotional distress to Rachel would occur because of his actions, but he acted in reckless disregard of that fact nonetheless. There is, first, the fact that Rachel was 15 at the time of her relationship with Croom, and Croom was 51. Secondly, Croom was a relative and close friend. The conclusion that his age and relationship exerted considerable influence over a minor girl is undeniable. According to Rachel, he used wine and medication to wear down her defenses in his home and forced sex upon her. He then relentlessly pursued Rachel, by his own admission, even to the point of causing an emotionally wrenching confrontation with Younts at her home which resulted in Rachel's first suicide attempt. It was clear that Croom was fomenting a schism in the family relationship and forcing Rachel to break with her mother and side with him. Rachel described her state of mind at the time as "chaotic," and suicide attempts followed. We have no doubt that Croom should have known the impact of his actions on Rachel but pursued his course of action in reckless disregard of the consequences to her. *See Growth Properties I* v. *Cannon,* 282 Ark. 472, 669 S.W.2d 447 (1984).

We next consider whether Croom's actions were so outrageous and extreme as to meet the test of the tort of outrage. Certain facts in this case are undisputed — the age and relationship of Croom and Rachel, the fact that sexual relations occurred between the pair, the stark confrontation between Croom and Younts, Rachel's suicide attempts, and her hospitalization. Where the rendition of events by Croom and Rachel diverges is over who was the catalyst for the sexual relationship and whether wine and medication were employed when they first had sex. Croom was never asked at trial whether he gave Rachel wine and Xanax, although he did admit that he was drinking alcoholic beverages on a daily basis and was taking Xanax himself. As we have already stated, in outrage cases to determine whether evidence is substantial we look to the evidence that supports the verdict and favors the appellee — in this case Younts. Rachel was adamant that Croom precipitated the relationship and that he used wine and medication to lower her defenses.

■ The facts of this case go beyond a mere sexual encounter but instead challenge basic social mores in our society. The

use of wine and medication by a vastly older and more experienced relative to foist sex on a minor cousin in his home offends all sense of decency as it is commonly understood and cannot be tolerated. We have no hesitancy in holding that these facts meet the test for substantial evidence even under the restrictive standards which we use in tort-of-outrage cases.

For his second point, Younts maintains that the Arkansas Model Instruction 2217 on punitive damages given to the jury was error. The instruction given reads as follows:

> In addition to compensatory damages for any actual loss that plaintiffs may have sustained, they ask for punitive damages from the defendant. Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from the defendant, the plaintiffs have the burden of proving either:

> First, that the defendant knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally and probably result in damage and that he continued such conduct in reckless disregard of the consequences from which malice may be inferred; or

> Second, that defendant intentionally pursued a course of conduct for the purpose of causing damages, or both.

> You are not required to assess punitive damages against the defendant, but you may do so if justified by the evidence.

Croom's basic contention is that the first prong of this instruction relates solely to negligence cases and that the tort of outrage is an intentional tort. Thus, he argues, the circuit court erred in giving an instruction which included the first prong. He cites *Tandy Corp.* v. *Bone, supra,* and *Ford Motor Credit Co.* v. *Herring,* 267 Ark. 201, 589 S.W.2d 584 (1979), in support of his argument. AMI 2217 was revised after the *Tandy Corp.* and *Ford Motor Credit Co.* decisions to include the second paragraph relating to *intentional* course of conduct. *See* AMI Civil 2d 2217 (1974 and Supp. 1986).

■ We give this issue little credence. The instruction is clearly couched in the alternative, and the jury could readily have discerned that the tort of outrage is an intentional tort and that the second paragraph of the instruction applied. No error was committed by giving AMI 2217 in its entirety.

Affirmed.