Mary HOLLOMON *v.* Dr. W.R. KEADLE

95-1231                                              931 S.W.2d 413

Supreme Court of Arkansas
Opinion delivered September 30, 1996

*William T. Mathis II*, for appellant.

*Wright, Chaney, Berry & Daniel, P.A.*, by: *Edward M. Slaughter*, for appellee.

ANDREE LAYTON ROAF, Justice. This case involves a claim for the tort of outrage brought by Appellant Mary Hollomon against

her former employer, Dr. W. R. Keadle. Hollomon alleges that Keadle repeatedly insulted her and subjected her to veiled threats of bodily harm. The trial court found that Hollomon's allegations were insufficient as a matter of law to state a claim for the tort of outrage, and further, that the First Amendment protected Keadle's statements; the trial court accordingly granted Keadle's motion for summary judgment. We affirm.

Mary Hollomon worked for Dr. Keadle, a sixty-eight-year-old physician, for approximately two years before she voluntarily left his employ. Hollomon alleges that during her employment, Keadle repeatedly cursed her and referred to her with offensive terms, such as "white nigger," "slut," "whore," and "the ignorance of Glenwood, Arkansas." Hollomon contends that Keadle frequently made, in her presence, degrading remarks about women such as: "women should be at home, not working, and if they are out there working they are whores and prostitutes...only whores and prostitutes work" and "any time a woman wears rings [other than wedding rings], she is a whore and a slut." In addition, Hollomon claims that Keadle frequently directed profanity at her in front of patients and other employees. In her deposition, Hollomon stated that she became aware that Keadle was a "grouch" by the second day of her employment with him and that he constantly yelled and cursed and used the "F" word almost every day. She stated that he cursed and belittled his wife and other women in his office.

According to Hollomon's deposition, Keadle also told her that he had connections with the mob in California and could pay one of his schizophrenic patients $500.00 to "take care of" anyone he chose. As an example of these "connections," Hollomon stated that Keadle told her that one of his former female employees "supposedly" died in an automobile accident in California. Finally, Hollomon states that Keadle told her that he carried a gun and that he had recently pulled the gun on a patient who angered him. Hollomon asserts that Keadle told her these stories to intimidate her and to suggest that he would have her killed if she quit or caused trouble.

Hollomon contends that she did not resign earlier because she feared Keadle would have her killed. In addition, Hollomon asserts that her status as a single parent and her dire financial condition, of which Keadle was aware, prevented her from leaving the job. Hollomon claims that Keadle's comments caused her stomach problems,

loss of sleep, loss of self-esteem, anxiety attacks, and embarrassment. In her deposition, Hollomon stated that she told Jim Butler, a counselor, about the constant ridicule by Keadle but admitted that she did not go to his office or seek counseling services from him. She further stated that Keadle's cursing upset her stomach and that Keadle and a Dr. Jansen gave her medication for her stomach problems. After two years and three months of working for Keadle, Hollomon alleges that she resigned because of his cursing. In his deposition, Keadle denied all of Hollomon's allegations.

██ On her first argument for reversal, Hollomon claims that the trial judge erred in granting summary judgment because genuine issues of material fact existed concerning whether or not Dr. Keadle made the alleged statements. Hollomon correctly argues that summary judgment is only appropriate when no issue of *material* fact exists, and the movant is entitled to judgment as a matter of law. *See*, Ark. R. Civ. P. 56 (c); *Browning* v. *Browning*, 319 Ark. 205, 890 S.W.2d 273 (1995). However, this court must first decide whether Hollomon's accusations, taken as true, state a claim for the tort of outrage. *Rainey* v. *Travis*, 312 Ark. 460, 850 S.W.2d 839 (1993). As we explained in *Rainey*, if the appellant cannot state a claim for outrage then any unresolved factual issues are simply irrelevant. *Id.*

██ Hollomon next asserts that the trial court erred by holding that the facts she alleged did not support a cause of action for the tort of outrage or intentional infliction of emotional distress. We have said that to succeed on a tort-of-outrage claim, the plaintiff must prove: 1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; 2) the conduct was extreme and outrageous, and was utterly intolerable in a civilized community; 3) the defendant's conduct was the cause of the plaintiff's distress; and 4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Cherepski* v. *Walker*, 323 Ark. 43, 913 S.W.2d 761 (1996); *Croom* v. *Younts*, 323 Ark. 95, 913 S.W.2d 283 (1996).

Hollomon relies primarily on the case of *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984) to support her argument that the trial court erred when it found that her allegations, even if true, did not state a claim for the tort of outrage. *Tandy* also involved an action by an employee against an employer. Although this court

reversed a jury verdict in favor of the plaintiff-employee based on an improper jury instruction and certain comments made by the trial court, we found that the evidence presented by Bone was sufficient to allow a jury to determine whether his employer was guilty of outrageous conduct that was the proximate cause of his emotional distress.

However, in *Tandy*, we stated that:

> [w]e have taken a somewhat strict approach to this cause of action. Recognition of this new tort should not and does not open the doors of the courts to every slight insult or indignity one must endure in life. For example, abrasive profanity alone is not sufficient reason to have a cause of action.

*Tandy*, 283 Ark. at 405, 678 S.W.2d at 315.

Bone was the manager of a Radio Shack store who was questioned by his employer in the course of an investigation into thefts which took place at his store. Bone testified that he was questioned throughout an entire day, and was cursed and threatened by Tandy's security personnel. He further alleged that he was twice refused permission to take a tranquilizer which had been prescribed to him by a psychiatrist for three years. It was the latter testimony by Bone which concerned this court, and we stated that:

> The conduct on the part of the employer that does give us difficulty is the undisputed evidence that Bone was obviously undergoing a good deal of stress, requested his Valium or medication, and was denied that privilege. *The employer was on notice at that point that Bone may not have been a person of ordinary temperament, able to endure a stressful situation such as he was placed in without injury... We emphasize that the notice to the employer of Bone's condition is the only basis for a jury question of extreme outrage.*

*Tandy*, 283 Ark. at 405-408, 678 S.W.2d at 316. (Emphasis added.)

Because of the holding in *Tandy*, we do not reach the question of whether Keadle's conduct was "extreme and outrageous" and "utterly intolerable in a civilized community," that is, whether "the recitation of the facts to an average member of their community would arouse his resentment against the actor and lead him to exclaim,' outrageous.' " *See* Restatement (Second) of Torts § 46, cmt. d.

■ We conclude that Hollomon, unlike Bone, has failed to establish that her employer was made aware that she was "not a person of ordinary temperament" or that she was "peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." *See* Restatement of Torts (Second) § 46, cmt. f. In her brief filed in response to Keadle's motion for summary judgment, Hollomon asserted that she was "assured that Keadle's actions would cease." She does not state in her abstract who assured her of this or whether she notified Keadle of any mental or physical condition which would make her peculiarly susceptible to stress. Although she claims that her status as a single parent caused her to remain in Keadle's employment for over two years, we cannot say that this status is in any respect unique, or that it constitutes a physical or mental condition necessary under our holding in *Tandy, supra*.

■ We also cannot say that Hollomon has alleged that Keadle had notice of the alleged severity of the emotional distress. In her deposition, Hollomon stated that Keadle gave her Zantac for her stomach and that she also obtained medication from Dr. Jansen for her upset stomach. However, even if Hollomon's general assertions of stomach problems, loss of sleep, anxiety, and embarrassment can be said to constitute distress "so severe that no reasonable man could be expected to endure it," we cannot determine from her abstract that she ever made Keadle aware that he had inflicted such distress upon her. In fact, Hollomon stated that Keadle on occasion urged her to "[T]ake up for your God damn self!" but said that she was reluctant to let him know how upset she was with him and that she was afraid to voice her opinion to him because of her lack of self-esteem. She further stated that she filed the lawsuit against him because "I'm tired of him belittling women." As to her allegations that Keadle made veiled threats to have her "taken care of," Hollomon admitted that Keadle never directly threatened her and stated simply that she "didn't put anything past the man."

Keadle argues in response that even if Hollomon's assertions are true, this court has established strict requirements for the tort of outrage, particularly in the context of employment; he is correct. We have considered this issue a number of times in cases of employee discharge; however, only in *Tandy, supra*, have we held that an employee has met the standard for proving the tort of outrage in such a case.

■ In *City of Green Forest* v. *Morse*, 316 Ark. 540, 873 S.W.2d 155 (1994), we reversed a jury verdict for unlawful discharge and for the tort of outrage. Morse was discharged as a policeman after he was involved in an accident during a high speed chase. Morse alleged in his outrage claim that the chief of police, during a fourteen-month employer-employee relationship, showed anger towards him, cursed him, asked whether he was paying his creditors and whether he held parties at which he served alcohol to minors, chastised him about drinking soft drinks in his patrol car, accused him of lying and of filing a false accident report, and told him that sheriffs in three counties would arrest him for making a false report. Morse claimed that he was constantly on edge during his employment. In reversing and dismissing Morse's outrage claim, we said:

> We have consistently taken a narrow view in recognizing claims for the tort of outrage that arise out of the discharge of an employee. The reason is that an employer must be given considerable latitude in dealing with employees, and at the same time, an employee will frequently feel considerable insult when discharged.

*Green Forest*, 316 Ark. at 542, 873 S.W.2d at 156.

■ In *Smith* v. *American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683 (1991), we upheld the dismissal of an outrage claim in an employee-discharge context where the employee alleged that he was wrongfully terminated after his shift leader had hit him during a dispute, stating:

> The type of conduct that meets the standard for an outrage cause of action must be determined on a case-by-case basis. We have taken a strict view in recognizing such a claim, especially in employment relationship situations. The extreme and outrageous character of the conduct may arise from the employer's knowledge that the employee is peculiarly susceptible to emotional distress by reason of some physical or mental peculiarity. The conduct may become outrageous if the employer continues it in the face of such knowledge, where it would not be so if he did not know. The fact that an employer continues unjustifiable conduct over a long period of time can be an important factor weighing in favor of a finding that the employer's conduct towards

an employee was outrageous.

*Smith*, 304 Ark. at 602, 804 S.W.2d at 686. (Citations omitted.)

Likewise, in *Sterling v. Upjohn Healthcare Servs. Inc.*, 299 Ark. 278, 772 S.W.2d 329 (1989), we upheld the granting of summary judgment in favor of the employer where an employee alleged that his supervisor took a dislike to him, undermined him in various ways, falsely told other employees that he was always drunk, falsely accused him of lying on his job application, cursed him, and became violent when discussing him with other employees. *See also Mechanics Lumber Co. v. Smith*, 296 Ark. 285, 752 S.W.2d 763 (1988); *Ingram v. Pirelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103 (1988); *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988); *Givens v. Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982).

■ Although Hollomon was not discharged, nor does she claim that she was constructively discharged, we have consistently stated that we will take a strict view in recognizing a claim for the tort of outrage in employment–relationship situations. The rationale for doing so holds true whether the employee bringing such a claim has been discharged or resigns. Here, Hollomon knew by the second day of her employment with Keadle that he was a singularly unpleasant man given to constantly yelling and cursing, yet she remained in his employment for more than two years. In *Tandy, supra*, we said that "abrasive profanity alone is not sufficient reason to bring a cause of action." Absent a showing that the employer had knowledge that the employee was "peculiarly susceptible to emotional distress by reasons of some physical or mental condition or peculiarity" and "proceeds in the face of such knowledge," we do not depart from that position. *See* Restatement of Torts (Second) § 46.

■ Because we affirm the trial court's finding that Hollomon's allegations were insufficient as a matter of law to state a claim for the tort of outrage, we do not reach the issue of whether Keadle's speech was protected by the First Amendment.

Affirmed.