CITY OF GREEN FOREST, et al. *v.* Hugh MORSE

93-1021 873 S.W.2d 154

Supreme Court of Arkansas
Opinion delivered April 11, 1994

 ██

 
 █

*Terry R. Ballard*, for appellants.

*F. Lewis Steenken*, for appellee.

ROBERT H. DUDLEY, Justice. Plaintiff, Hugh Morse, was employed as a police officer by the defendant, City of Green Forest, in May 1986. Defendant William Andrews was the Chief of Police. Morse and Chief Andrews had a strained relationship. Andrews, rightly or wrongly, thought Morse had a number of faults as a police officer. On July 10, 1987, Morse engaged in a high speed chase which resulted in a wreck. Morse, an employee-at-will, was discharged by the City on July 27, 1987, for engaging in the high speed chase and for submitting an accident report that Andrews thought was false. Morse sued both the City and Andrews. A jury returned a $5,000 verdict against the City in the wrongful discharge, a $10,000 verdict against Andrews for wrongful discharge, and a $22,000 verdict against Andrews for the tort of outrage. Both the City and Andrews appeal. We reverse and dismiss.

██ We have consistently taken a narrow view in recognizing claims for the tort of outrage that arise out of the discharge of an employee. The reason is that an employer must be given considerable latitude in dealing with employees, and at the same time, an employee will frequently feel considerable insult when discharged. In this context we have written: "Because of the employer's right to discharge an at-will employee, a claim of outrage by an at-will employee cannot be predicated upon the fact of the discharge alone. However, the manner in which the discharge is accomplished or the circumstances under which it occurs may render the employer liable." *Harris* v. *Arkansas Book Co.*, 287 Ark. 353, 356, 700 S.W.2d 41, 43 (1985). In another employee discharge case, *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 244-45, 743 S.W.2d 380, 383 (1988), we wrote, "The recognition of the tort of outrage does not open the doors of the courts to every slight insult or indignity one must endure in life." In other employee discharge cases we have held that the facts surrounding the discharge did not meet the criteria for the tort of outrage. *Smith* v. *American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d

683 (1991); *Sterling* v. *Upjohn Healthcare Servs., Inc.*, 299 Ark. 278, 772 S.W.2d 329 (1989); *Ingram* v. *Pirelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103 (1988). The duty owed is a matter of law, and we have said that duty is to refrain from conduct that is so extreme and outrageous as to go beyond all possible bounds of decency and to be utterly intolerable in a civilized society. *M.B.M. Co.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980).

Only once have we held that a plaintiff met the standard for proving the tort of outrage in an employee discharge case. That case was *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). The facts surrounding that discharge were so extreme and outrageous that they went beyond the bounds of decency and truly were intolerable. The employer, Tandy Corporation, thought that Bone, the manager of one of its stores in Little Rock, was stealing either money or merchandise. Bone suffered from a personality disorder which made him more susceptible to stress and fear than normal. His psychiatrist had prescribed, and he had been taking, a tranquilizer for three years. Bone's supervisor and two security officers came to the store to conduct an investigation of the losses. Bone was questioned at thirty minute intervals throughout the day. According to Bone, the security men cursed him, threatened him, and refused to allow him to take his prescribed medication. Bone was subsequently asked to take a polygraph examination and consented. At that time he was in a highly agitated condition and again asked for his medication. The request was denied. He testified that on at least three occasions he had asked to be allowed to take his medication, but each time his request was refused. He stated that once he reached in a desk drawer for his medicine, but one of the investigators slammed the drawer shut. He was eventually taken to another location in Little Rock for the examination, and, while there, hyperventilated. An ambulance was called, but Bone was taken home by the supervisor. The next day, Bone attempted to return to work, but was unable to do so. He was subsequently hospitalized for a week. In holding that Bone had met the standard for the tort of outrage surrounding the discharge, we endeavored to make the basis for the holding clear when we wrote:

> It was for the jury to decide whether under the circumstances it was outrageous conduct for the employer to deny Bone his medication and to continue to pursue the inves-

tigation knowing Bone was on medication or Valium. *We emphasize that the notice to the employer of Bone's condition is the only basis for the jury question of extreme outrage.*

*Tandy Corp.*, 283 Ark. at 408, 678 S.W.2d at 317 (emphasis supplied). The case was reversed and remanded on other grounds.

■ The facts of this case do not come close to meeting the standard for the tort of outrage. Viewing the evidence, and all inferences from that evidence, most favorably to appellee Morse, the facts do not show any act wholly beyond the bounds of decency surrounding the discharge. It is undisputed that a high speed chase and wreck occurred and that Morse filed an accident report. He was subsequently suspended with pay. The chief then wrote a letter to the City Council requesting the dismissal of Morse. A meeting of the Council was held. Subsequently, the City Council discharged Morse. The facts surrounding the discharge do not constitute the tort of outrage.

Morse contends that even if the facts immediately surrounding the discharge were insufficient for the tort of outrage, all of the other indignities that he endured during his tenure as a police officer were sufficient to meet the standard for the tort. He bases his argument on the case of *Hess* v. *Treece*, 286 Ark. 434, 693 S.W.2d 792, *cert. denied*, 475 U.S. 1036 (1985). In that case, Hess, a city director during most of the material time, had a very strong dislike for Treece, a city policeman, over an incident involving a girlfriend. Hess stated that he would have Treece's job at any cost. Over a two-year period he made vengeful attempts to have Treece fired and, in doing so, acted in a manner that went beyond the bounds of decency and inflicted severe emotional distress on Treece. Hess frequently called Treece's superior officers to complain about Treece. On one occasion he notified one of the superiors that Treece was in an apartment at a time when he was supposed to be at work. A police investigation found Treece innocent of the charge. Hess made other frenzied and groundless charges, which caused departmental investigations. Hess asked Treece's bookkeeper to watch his movements and report those movements back to him. Police supervisors testified they were called upon by Hess sometimes as often as twice a week over the two-year period to investigate Treece's conduct.

Treece's superiors frequently questioned him about his activities. Hess also contacted the city manager and the assistant chief and sought to have Treece fired. Hess employed a woman who lived in the same apartment as Treece to report on Treece's movements. Hess frequently called the police department from the woman's apartment, and he told her that he would spend every dime he had to see that Treece was fired. Hess even contacted a newspaper reporter and told him that Treece was being paid to perform private security duty while he was supposed to be on duty for the police department. Treece knew of Hess's actions and became concerned for his safety and the safety of his family. He changed his lifestyle because of the fear. Fellow police officers testified that over the two-year period Treece became distraught, nervous, frightened, and asked for their help. Under those facts, we affirmed the jury's finding that Hess's conduct was utterly intolerable in a civilized society.

The case at bar does not rise to the same level of conduct. Plaintiff Morse and defendant Andrews, the chief of police, had a rocky, fourteen-month employer-employee relationship. Morse was hired as a employee-at-will, and, under the applicable statutes, was a probationary police officer. His probation was extended on two occasions by Andrews. Andrews showed anger toward Morse on occasion and cursed him. The proof also showed that during the same period Andrews got angry at other officers and likewise cursed them. Andrews inquired about Morse's personal debts and whether he was paying his creditors, about his roommate, who was a former convict, and whether he had parties at which he served alcohol to minors. Andrews chastised Morse for drinking soft drinks in the squad car and accused him of fabricating an excuse for not attending a short course on the operation of a breathalyzer machine. There were other minor incidents. Morse testified that he was constantly on edge while working for the department. Morse testified that the accident report he filed was not false, and that Andrews was in error in thinking that it was. He also said that Andrews told him that sheriffs in three counties would arrest him for making a false report. Such proof does not reach the level of being so extreme and outrageous as to be utterly intolerable in a civilized society. As we said in *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), we have not opened the doors of the court-

house to every insult or indignity one must endure in life. Accordingly, we reverse and dismiss the claim for the tort of outrage.

■ Appellants next contend that the evidence was not sufficient to support the awards for wrongful discharge. Again, the argument has merit. Morse was hired as a probationary officer. He was an at-will employee. "It is the general rule that 'when the term of employment in a contract is left to the discretion of either party, or left indefinite, or terminable by either party, either party may put an end to the relationship *at will* and *without cause*.'" *Wal-Mart Stores, Inc.* v. *Baysinger*, 306 Ark. 239, 244, 812 S.W.2d 463, 466 (1991) (quoting *Griffin* v. *Erickson*, 277 Ark. 433, 436, 642 S.W.2d 308, 310 (1982) (emphasis added). We further stated, "Generally, 'employment is held only by mutual consent, and at common law the right of the employer to terminate the employment is *unconditional* and *absolute*.'" *Baysinger*, 306 Ark. at 244, 812 S.W.2d at 466 (quoting *Griffin*, 277 Ark. at 436, 642 S.W.2d at 310).

■ In *Sterling Drug*, we approvingly quoted from a United States District Court opinion that outlined four exceptions to the employment-at-will doctrine. We quoted:

> Arkansas law would recognize at least four exceptions to the at-will doctrine, excluding implied contracts and estoppel. These are: (1) cases in which the employee is discharged for refusing to violate a criminal statute; (2) cases in which the employee is discharged for exercising a statutory right; (3) cases in which the employee is discharged for complying with a statutory duty; and (4) cases in which employees are discharged in violation of the general public policy of the state.

*Sterling Drug*, 294 Ark. at 245, 743 S.W.2d at 383 (quoting *Scholtes* v. *Signal Delivery Serv., Inc.*, 548 F. Supp. 487, 494 (W.D. Ark. 1982)). In *Sterling Drug*, we recognized a public policy exception when an employer discharges an employee for disclosing that the employer was submitting false information to the government in contract negotiations. We wrote: "Therefore, we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired *in violation of a well-established public policy of the state. This is a limited exception to the*

*employment-at-will doctrine. It is not meant to protect merely private or proprietary interests." Sterling Drug*, 294 Ark. at 249, 743 S.W.2d at 385 (emphasis supplied). In sum, the exceptions to the at-will doctrine will be recognized *to protect a well-established and substantial public policy* and not merely to protect the private or proprietary interests of the employee. The existence of a clear and substantial public policy presents a question of law.

All of the exceptions to the at-will doctrine listed in *Sterling Drug* are based on well-established and substantial public policy. Thus, under our established case law, the City had full discretion to discharge Morse with or without cause unless he came within one of the exceptions which are recognized to protect an established public policy. Stated differently, unless Morse could establish that his discharge would jeopardize some substantial and well-established public policy, the City had complete discretion to fire him.

Morse argues that he comes within an exception because he was discharged for complying with a statutory duty. He contends that (1) Ark. Code Ann. § 14-44-113 (1987) requires a police officer "to pursue and arrest any person fleeing from justice," (2) that he was pursuing a person who was fleeing from justice when he wrecked the police car, and (3) his discharge was the result of the wreck and therefore against public policy. Morse's contention that he is entitled to recover for wrongful discharge is without merit for two reasons. First, his construction of the statute is skewed. The word "pursue" means to follow with enmity. *Webster's Third New Int'l Dictionary* 1848 (1961). Enmity means ill will such as actuates a personal enemy. *Id.* at 754. The statute means that a police officer is charged with the duty of following a lawbreaker with dogged determination for the purpose of arresting him. It does not mean that a police officer is required to drive a police car at high speeds in contravention of departmental policy and required to endanger lives of others, in order to immediately arrest a misdemeanant. Second, Morse was not fired for violating a *substantial and well-established public policy*. There is no substantial and well-established public policy that requires a police officer to drive a police car at unsafe speeds in order to arrest a misdemeanant. Rather, cities have a legitimate public policy interest in preventing such dan-

gerous chases. There is no damage to a substantial public policy if cities are allowed to discharge police officers for engaging in dangerous high speed chases of misdemeanants.

Finally, Morse's argument ignores the obvious fact that the manner in which he pursued the misdemeanant was only one of the factors, albeit an important one, that contributed to his discharge. Chief Andrews testified, and Morse agreed, that Andrews constantly stated, rightly or wrongly, that Morse's performance as a police officer was lacking. Morse was fired for what was perceived, rightly or wrongly, by Andrews and the City Council as poor performance as a police officer, for the manner in which he conducted the pursuit, and for falsifying a report about the accident. However, even if he were fired solely for the manner in which he conducted the pursuit, there is no public policy that requires a police officer to pursue a nondangerous offender at high speeds. In sum, there was no evidence, or fair inference from the evidence, that Morse was fired solely for carrying out a well-established public policy of the State. Consequently, we must also reverse and dismiss the verdicts for wrongful discharge.

Reversed and dismissed.

HOLT, C.J., NEWBERN and BROWN, JJ., dissent in part and concur in part.

ROBERT L. BROWN, Justice, Concurring in part; dissenting in part. I concur completely in the majority's reversal of the verdict for tort of outrage but would affirm the jury's verdicts for wrongful discharge.

While Hugh Morse may well have been an at-will employee, he was fired in significant part for fulfilling his duties as a law enforcement officer and that raises a jury question of whether the public policy of the State of Arkansas has been contravened. As the majority points out, this court has held that one exception to the at-will doctrine occurs when an employee is discharged for performing a duty which that employee is obligated by statute to perform. *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), *citing Scholtes* v. *Signal Delivery Service, Inc.*, 548 F.Supp. 487 (W.D. Ark. 1982). That is what occurred in this case.

The public policy of this state is found in its constitution and statutes. The statute applicable to these circumstances, according to the majority, defines the duty of police officers:

(3) Pursue and arrest any person fleeing from justice in any part of this state; and

(4) Apprehend any persons in the act of committing any offense against the laws of the state or the ordinances of the city and forthwith to bring such persons before the mayor or other competent authority, for examination or trial.

Ark. Code Ann. § 14-44-113(b)(3) & (4) (1987).

By dismissing Morse for a high speed chase of a DWI offender, Chief Andrews appears to have terminated Morse for doing precisely what he was supposed to do — pursue one who violates the law and flees from authority. Here, the chase began when Morse observed a suspicious individual get in a brown Dodge pick-up truck and begin driving erratically in the wrong lane. Morse pulled behind the truck and put on his blue lights. The driver refused to pull over and increased his speed to over 80 miles per hour. Morse got on his radio and reported the matter. He testified that he was told to give pursuit. He did so on a dusty road and wrecked his police car.

Chief Andrews responded to the accident scene. Morse told the Chief that the suspect must have rammed him. The Chief disagreed. Morse said he was pressured by the Chief to file his report of the incident as soon as possible. In his report, Morse apparently stated that the suspect rammed him. Chief Andrews did not believe that this occurred. Morse then prepared a second report which included information that he said he omitted from his first report. Chief Andrews still did not believe Morse's version of the events.

Chief Andrews sent the City Council a memo setting out his belief that Morse's actions violated police procedures outlined in his manual entitled "Andy's Red Book". The manual lists seven factors that should be considered *before* an officer engages in a high speed chase. They are: (1) type of violation; (2) weather conditions; (3) road conditions; (4) visibility; (5)

danger to motorists and pedestrians; (6) availability of assistance; and (7) probability of success. Applying these seven factors to the case at hand, the City Council first suspended Morse and then dismissed him.

At trial, Morse maintained that the high speed chase and accident was the sole reason for his dismissal. Chief Andrews disagreed but did admit that he too would have initiated pursuit against the suspect driver. The issue then seems to be when should Morse have broken off the chase.

It is clear that the dogged pursuit by Morse was an integral reason for his termination. It is also clear that Chief Andrews and Morse had a personality problem and that Morse believed that the Chief used the chase and accident as a means of getting rid of him. This, to my way of thinking at least, raises the spectre of penalizing Morse for doing his duty according to statute with unfortunate results. We have said that a firing caused by an employee's claim for workers' compensation benefits runs afoul of state policy. *Mapco, Inc.* v. *Payne*, 306 Ark. 198, 812 S.W.2d 483 (1991). In that case we noted that the employee had presented sufficient facts for the matter to go to the jury. That the public policy exception presents a fact question has been referenced in other cases. *See Cross* v. *Coffman*, 304 Ark. 666, 805 S.W.2d 44 (1991); *Webb* v. *HCA Health Services of Midwest, Inc.*, 300 Ark. 613, 780 S.W.2d 571 (1989).

Police chiefs and city councils must be endowed with the authority to fix policy and criteria for termination. And a law enforcement officer who goes too far and is overly zealous in executing his duties should be subject to punishment. The circumstances in this case, however, do present an issue as to whether other motives were at work here. At least a sufficient fact question has been raised.

In my judgment, this was a proper matter for the jury's resolution. The jury found in Morse's favor. I would defer to that verdict and affirm the judgments for wrongful discharge.

HOLT, C.J., and NEWBERN, J., join.

CORBIN, J., not participating.