Eugene CRENSHAW, Plaintiff,

v.

**GEORGIA–PACIFIC CORPORATION,**
Defendant.

No. 94–6125.

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Sept. 27, 1995.

94

Q. Byrum Hurst, Hurst Law Offices, Hot Springs, AR, for plaintiff.

Jeffrey A. Walker and Paula A. Graves, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, for defendant.

### ORDER

HENDREN, District Judge.

NOW on this 27 day of September, 1995, comes on for consideration defendant's Motion for Summary Judgment. A response has been filed, and the Court, being well and sufficiently advised, finds as follows:

### Standard for Determining Summary Judgment

1. This Court's function at the summary judgment stage is not to weigh the evidence, but to determine "whether the record, when viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Langley v. Allstate Insurance Co.,* 995 F.2d 841, 844 (8th Cir.1993). "To survive a motion for summary judgment, the non-moving party need only show sufficient evidence that supports a material factual dispute that would require resolution by a trier of fact." *Id.*

'The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact ... Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Id.* at 844, quoting from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Where the party against whom summary judgment is sought has the ultimate burden of proof, the party seeking summary judgment can show his entitlement to summary judgment by " 'showing'—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). After movant does this, the burden shifts to the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553, quoting Fed.R.Civ.P. 56(e). If the non-moving party fails to do this, then the moving party is entitled to summary judgment.

Rule 56(e) of the Federal Rules of Civil Procedure provides, in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In evaluating evidence submitted in support of and opposition to a motion for summary judgment, the question is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Supra.* 477 U.S. at 252, 106 S.Ct. at 2512.

### Motion and Response

2. In plaintiff's complaint, plaintiff alleges that he was employed by defendant for approximately twenty (20) years, and had a good work record. It is alleged that while plaintiff was employed as a Storeroom Window Clerk, in August of 1992, an employee of an outside contractor involved plaintiff in certain missing property of defendant. Plaintiff was called in for questioning and was immediately suspended pending "further investigation." Plaintiff was subsequently terminated.

Plaintiff initially sought relief based upon two (2) separate claims: 1) Count 1—42 U.S.C. § 2000e—discrimination based upon race; and 2) Count 2—intentional infliction of emotional distress.

By Order entered on April 27, 1995, the Court dismissed Count 1. Therefore, all that is remaining before this Court is the claim contained in Count 2—intentional infliction of emotional distress.

3. In defendant's Motion for Summary Judgment, defendant contends: 1) the facts alleged fail to state a claim as a matter of law; 2) plaintiff's claim is preempted by the Labor Management Relations Act ("LMRA"); and 3) the Arkansas Workers' Compensation Act provides the exclusive remedy for Crenshaw's alleged injuries. Defendant submitted relevant portions of plaintiff's deposition; an affidavit of Dave Huffman; the labor agreement between defendant and the union; and various other documents in support of its motion.

Defendant contends that plaintiff's action does not rise to the level required by Arkansas law to support a claim for intentional infliction of emotional distress. Defendant also claims that plaintiff's claim is preempted by the LMRA, because resolution of his claim depends substantially upon interpretation of the labor contract. Finally, defendant argues that claims based on psychological employment disabilities are compensable under the Arkansas Workers' Compensation Act, which is the exclusive remedy for plaintiff.

4. In response, plaintiff contends defendant had power over plaintiff, and that when he was accused of misconduct of a severe nature—theft he suffered extreme humiliation as a result of being terminated because

of the accusations. It is alleged that he was forced to cause a union investigation to take place in order to clear his name and restore his entitlement to his "wrongfully taken employment" and its concurrent benefits. Plaintiff also argues that the LMRA would preempt his claim only if the court must construe or interpret a collective bargaining agreement to rule on his emotional distress claim. He states that his claim does not seek to locate any of defendant, expressly or by implication, in any special obligation imposed on defendant by its labor contract. Plaintiff finally argues that his injury does not fall within the category of injuries compensable under the Arkansas Workers' Compensation Act and the Act therefore cannot be the exclusive remedy for his injury.

*Discussion*

5. *Failure to State a Claim*—At his deposition taken on May 24, 1995, plaintiff responded to several questions which are relevant to the Court's determination of whether there are material facts in dispute on his emotional distress claim. Some of plaintiff's responses are as follows:

a. Plaintiff denied ever having problems with anyone in management or with his boss or supervisor at Georgia–Pacific, and denied he was mistreated. (Page 34)

b. Plaintiff said there was no one in particular that he personally felt like intentionally inflicted distress on him, but instead referred to rumors. He specifically stated that Mr. Clark, Mr. Wilt, and Mr. Roterhmel never did anything in particular to him that he knew of. Plaintiff stated that it was just the circumstances that bothered him. (Page 65)

c. He stated he was not accusing Georgia–Pacific of telling his aunt that he was in jail or in the hospital, which were apparently rumors being spread about him. (Page 68)

d. The first meeting plaintiff had with Mr. Grunz about the accusations by Mr. Gonzales about the missing property lasted about twenty minutes, and at that meeting Mr. Grunz, after reading the statement of Mr. Gonzales to plaintiff, gave plaintiff a chance to tell his side of the story. (Pages 76–77)

e. Plaintiff admitted that he had given out property of defendants without permission or authorization. (Pages 77–78)

f. During the first meeting, no one got angry or loud or shouted. (Pages 81–82)

g. At the second meeting on the following Monday when plaintiff was terminated, said meeting lasted about fifteen or twenty minutes, and no one ever got loud or angry or violent. It was a relatively calm meeting. (Pages 93–94)

h. There is nothing different in this lawsuit that plaintiff is claiming that is different from what plaintiff claimed before the arbitrator. (Page 122)

i. Plaintiff did not have to go to a doctor or seek any counseling or anything like that while he was off from work, from August of 1992 through May of 1993. He merely spent his time looking for work and worried about working. Plaintiff did not suffer from any physical problems or emotional problems. (Page 157)

In plaintiff's affidavit signed on August 8, 1995, he states that as a result of his termination from employment he had held for over twenty years, he suffered "extreme emotional and mental stress." He states that he felt humiliated and embarrassed to have gone through such an incident and for his good name in the community to have suffered as it did. He further states that his son felt embarrassed and humiliated as well because of the accusations and the talk in the community about the incident. He continues:

I felt stress as I knew I could not support my family or pay my financial obligations without the employment I needed and had worked so hard for [sic] over twenty years. I knew that because of my age and my experience in this limited field of work, I would have a difficult time finding employment anywhere else. I suffered great mental anguish as a result of the ordeal, and I lost weight from the worry and lack of sleep. I heard from family members and members of the community that Georgia–Pacific employees had told others that I had been fired for stealing. The grief, shame, humiliation, anger, disappointment and embarrassment I felt are difficult to

express in words, but did take their toll on my emotional well-being and were expressed in the form of depression, loss of appetite, lack of sleep, headache, worry, and nausea. It is my opinion that the emotional distress I underwent were more than any reasonable person should have to undergo.

In *Givens v. Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982), upon plaintiff's motion for summary judgment on the tort of outrage claim, and after examining discovery testimony, the Arkansas Supreme court concluded:

The new and still developing tort of outrage is not easily established. It requires clear-cut proof. "Liability has been found *only* [our italics] where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement of Torts (2d), § 46, Comment *d* (1965); *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). It is for the trial court to determine, in the first instance, whether the conduct may reasonably be regarded as so outrageous as to permit recovery. Restatement, *id.*, Comment *h*. Merely describing conduct as outrageous does not make it so. If Givens's testimony presents an issue of fact, then any employee who is abruptly discharged by an angry boss is entitled to have the asserted tort submitted to a jury. That is not the law. The trial judge was unquestionably right in granting the partial summary judgment. . . .

*Id.* 275 Ark. at 372, 631 S.W.2d at 264.

In *City of Green Forest v. Morse*, 316 Ark. 540, 873 S.W.2d 155 (1994), the Arkansas Supreme Court discussed the tort of outrage as it relates to the discharge of an employee.

We have consistently taken a narrow view in recognizing claims for the tort of outrage that arise out of the discharge of an employee. The reason is that an employer must be given considerable latitude in dealing with employees, and at the same time, an employee will frequently feel considerable insult when discharged. In this context we have written: "Because of the employer's right to discharge an at-will employee, a claim of outrage by an at-will employee cannot be predicated upon the fact of the discharge alone. However, the manner in which the discharge is accomplished or the circumstances under which it occurs may render the employer liable." *Harris v. Arkansas Book Co.*, 287 Ark. 353, 356, 700 S.W.2d 41, 43 (1985). In another employee discharge case, *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 244-45, 743 S.W.2d 380, 383 (1988), we wrote, "The recognition of the tort of outrage does not open the doors of the courts to every slight insult or indignity one must endure in life." In other employee discharge cases we have held that the facts surrounding the discharge did not meet the criteria for the tort of outrage. *Smith v. American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683 (1991); *Sterling v. Upjohn Healthcare Servs., Inc.*, 299 Ark. 278, 772 S.W.2d 329 (1989); *Ingram v. Pirelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103 (1988). The duty owed is a matter of law, and we have said that duty is to refrain from conduct that is so extreme and outrageous as to go beyond all possible bounds of decency and to be utterly intolerable in a civilized society. *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980).

Only once have we held that a plaintiff met the standard for proving that tort of outrage in an employee discharge case. That case was *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). The facts surrounding that discharge were so extreme and outrageous that they went beyond the bounds of decency and truly were intolerable. . . . In holding that Bone had met the standard for the tort of outrage surrounding the discharge, we endeavored to make the basis for the holding clear when we wrote:

It was for the jury to decide whether under the circumstances it was outrageous conduct for the employer to deny Bone his medication and to continue to pursue the investigation knowing Bone was on medication or Valium. *We emphasize that the notice to the employer*

*of Bone's condition is the only basis for the jury question of extreme outrage. Tandy Corp.,* 283 Ark. at 408, 678 S.W.2d at 317 (emphasis supplied). The case was reversed and remanded on other grounds. *Id.,* 316 Ark. at 542–44, 873 S.W.2d at 156–57.

In *Hamaker v. Ivy,* 51 F.3d 108 (8th Cir. 1995), plaintiff brought a state tort claim of outrage against county officials after they arranged to have a false arrest warrant for plaintiff, charging him with "sexual harassment" served on him. The Eighth Circuit discussed the tort of outrage in Arkansas:

The Arkansas courts take a very narrow view of claims for the tort of outrage. (citation omitted). The courts have crafted a four-part test for a prima facie case of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. (citation omitted).

*Id.* at 110. *See also, Thornton v. Squyres,* 317 Ark. 374, 375, 877 S.W.2d 921, 922 (1994). The Court in *Hamaker* found elements (1) and (3) had been met and therefore concentrated their remaining discussion on elements (2) and (4). In discussing the second element—whether the conduct was extreme and outrageous—the Court stated:

Factors that bear on the determination of whether conduct is extreme and outrageous include: the conduct at issue; the period of time over which the conduct took place; the relation between plaintiff and defendant, (citation omitted), and defendant's knowledge that plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental peculiarity (citation omitted).

The conduct of Ables and her cohorts does not reach Arkansas's exacting standard for extreme and outrageous conduct: It consisted of a rather nasty, but not terribly unusual or shocking, practical joke that cannot be described by any reason-able person as going "beyond all bounds of decency." The period of time over which the conduct directly caused distress was brief: Hamaker discovered that the warrant was false within one-half hour. (citations omitted).

*Id.* at 111.

In discussing the fourth element—emotional distress—the Court stated:

... Hamaker and his witnesses testified that he was red-faced and angry, that immediately after the incident he had an increased heart rate and blood pressure, and that four days later, he had some trouble sleeping. These are the common symptoms of anger, frequently endured by reasonable people, and do not rise to the level required to make a prima facie case of outrage. *See Givens v. Hixon* [Hixson], 275 Ark. 370, 631 S.W.2d 263, 264 (1982) (summary judgment for defendant on a claim of outrage upheld, despite plaintiff's testimony that, after the incident giving rise to the claim, he was depressed, could not sleep or eat, lost weight, and entered a hospital a month later for a heart condition).

*Id.*

█ In his deposition, plaintiff admits that there is no one in Georgia–Pacific management who has mistreated him in any way. Additionally, plaintiff testified that he did not believe that Georgia–Pacific initiated the rumors being spread about him or is responsible for the erroneous statements. As urged by defendant, plaintiff's claim is premised solely upon his purported desire to cross-examine Gonzalez about his statement in front of mill management. However, plaintiff does not know how defendant could have forced Gonzalez to appear at the mill for a face-to-face meeting with plaintiff. Furthermore, plaintiff admits that he had the opportunity to ask Gonzalez to meet with mill management when he talked with him on the evening of August 7. Additionally, he does not deny that he was given the opportunity to speak at the meetings held with defendant management. The Court does not believe that the fact that defendant did not arrange

for Crenshaw to cross-examine his accuser supports a claim of outrage.

 Plaintiff's deposition was taken on May 24, 1995, and his affidavit was given on August 8, 1995, after the motion for summary judgment was filed. In plaintiff's deposition, he stated that he did not have to go to a doctor or seek any counseling while he was off work, but he merely worried about working, "among other things." He admitted that he suffered from no physical or emotional problems following his discharge. It was only later, in his affidavit signed on August 8, 1995, which was attached to the response for summary judgment that plaintiff said: "[A]s a result of my termination from employment I had held for over twenty years, I suffered extreme emotional and mental stress." As stated earlier, the act of discharge alone cannot form the basis for an outrage claim. Even though plaintiff states that his good name in the community suffered, and that he heard from family members that employees of defendant had told others he had been fired for stealing, in his deposition, he admitted that no one from defendant company was responsible for spreading rumors about him. Furthermore, even in his affidavit, plaintiff was unable to designate any specific Georgia–Pacific employee that he knew to have spread any rumor. Additionally, plaintiff admitted to giving away different items belonging to defendant without defendant's permission. The Court finds that plaintiff has not presented sufficient facts which indicate that defendant's conduct rose to the level of extreme and outrageous conduct, as required by Arkansas law.

 In his affidavit, plaintiff claims he suffered weight loss, lack of sleep, headache, worry, and nausea, and that he was concerned, because of his age and limited experience, that he would not be able to find a job to provide for his family. Even if the Court believed defendant's conduct was extreme and outrageous, which the Court does not, plaintiff has failed to present sufficient evidence that he suffered emotional distress as a result of such conduct. The symptoms suffered by plaintiff are symptoms anyone might experience upon the loss of a job.

The Court finds, based upon a review of the discovery evidence presented as well as the arguments presented in the briefs, that there are no material facts in dispute on the outrage claim, and that the facts as set forth above do not rise to the level of intentional infliction of emotional distress, as that phrase is defined by Arkansas law.

Accordingly, the Court finds the motion should be granted on the ground that plaintiff has failed to state a claim for the tort of intentional infliction of emotional distress.

6. *Plaintiff's Claim is Preempted by the LMRA*—Even if the Court were to believe that plaintiff had stated a valid outrage claim, the Court would nevertheless grant defendant's motion based upon its second ground asserted—that plaintiff's claim is preempted by the LMRA.

As pointed out by defendant, plaintiff's state law claim is based upon defendant's investigation of misconduct and the subsequent discharge of plaintiff under the collective bargaining agreement between defendant and the Union. Plaintiff does not dispute that a collective bargaining agreement between Georgia–Pacific and the United Paperworkers International Union, Locals 1327 and 1329 governed plaintiff's employment relationship with Georgia–Pacific. Plaintiff argues that his claim is independent of the labor contract.

Plaintiff's deposition indicates that plaintiff's complaint was that defendant did not give him an opportunity to confront his accuser—Mr. Gonzales—in front of defendant's management. In his deposition, plaintiff stated as follows:

Q. The question asked you to list the damages and state the basis for the claim, and it says that you allege that defendant discriminated against you by failing to provide due process as to the allegations against you, and that you were not allowed to question or cross examine the person who made the allegations. Would you just explain to me what you mean by that sentence?

A. I wasn't allowed to cross examine the person that brought the allegation against me. Well, I personally felt like I didn't

have any business asking him nothing else about it, I said all I needed to say to him that Friday when I told him he was wrong, I didn't feel like I needed to say anything else to him, if anything else was to be said to him, I thought maybe the company would bring him in or bring me in, or something, or go from there, or whoever, union or whatever, and that was the purpose for hiring a lawyer, where we could get to the bottom of it, you know, where we could go from there, because I didn't want to go and talk to him and ask him this, that and the other because the first thing about it, we know, we done determined he's going to lie, so why not stack up another one?

Q. Now, was it at the Monday meeting at the mill on August 10th, or at the arbitration hearing that you wanted to cross examine Mr. Gonzalez?

A. I didn't know, I had never been to an arbitration, I had never been in a situation like this before, when I was on my way there, or even coming up to arbitration, I was thinking that he was going to be there, I didn't know no different.

Q. So, it was the arbitration proceeding where you thought he should have been there?

A. Right, I thought he should have been there, that's what I thought.

Q. Do you know whether or not the union tried to get him there?

A. no ma'am, I don't.

Q. Do you know whether or not the union tried to get him there?

A. No ma'am, I don't.

Q. Do you know whether or not your lawyer tried to get him there?

A. My lawyer didn't have nothing to do with the arbitration.

Q. Did you make any efforts to get him there?

A. No ma'am, I didn't. At this time it was the union and they said they would handle it, and I left it at that, but I thought he was going to be there, and I was told, I think by Charles Ward, that they tried to get in contact with him.

Q. And what did Mr. Ward tell you?

A. He said he didn't know, he wasn't going to come, he didn't know, that's all, they tried to find him and that's it, so I didn't—

Q. do you know whether or not they could locate him?

A. I imagine he was still, at that time he was still in Ashdown.

Q. Did you make any effort to locate him?

A. No ma'am.

Q. then you said that the plaintiff alleges defendant engaged in intentional infliction of emotional distress, as well, and do I understand that the complaint you have or the basis for this intentional infliction claim is, again, the investigation process at the company and the fact that they terminated you?

A. Yes ma'am.

Q. Is there any other basis or complaint you have with regard to that intentional infliction claim:

A. No ma'am.

 "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim [citation omitted], or dismissed as pre-empted by federal labor-contract law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206 (1985). Furthermore, claims arising "out of the manner in which [the employer] conducted its investigation of suspected employee misconduct, and the way in which it terminated certain employees" are preempted by section 301 of the LMRA. *Mock v. T.G. & Y. Stores,* 971 F.2d 522, 530 (10th Cir.1992); *See also, Morris v. Ambassador Nursing Home,* 845 F.Supp. 1164, 1168 (E.D.Mich.1994) (court held intentional infliction claim preempted by LMRA; "outrageousness" of company's investigation of plaintiff's alleged wrongdoing on the job was dependent upon interpretation of the labor agreement). In *Johnson v. Anheuser Busch, Inc.,* 876 F.2d 620 (8th Cir.1989), the district court granted the employer's motion for summary judgment, finding that the intentional infliction claim was

preempted by section 301 of the LMRA. The Eighth Circuit stated:

> Similarly, Mr. Johnson's second count, alleging intentional infliction of emotional distress, arises out of his discharge and the appellees' conduct in the investigation leading up to it. Specifically, Johnson alleged in his petition that the outrageous conduct of Anheuser–Busch and its employees and the statements made by Parton, Lewis and Lorton "caused [him] severe and great emotional distress, and such accusations led to [his] arrest, prosecution and loss of his job." (Petition Count II, P. 5) To determine the merits of this allegation would require us to decide whether his discharge was warranted under the terms of the collective bargaining agreement. We conclude that this count depends substantially upon construing the collective bargaining agreement's terms. Therefore, section 301 preempts this count.

*Id.* at 624 (citation omitted).

The Court would, therefore, hold that plaintiff's claim in this case is substantially similar to that in *Johnson*. Plaintiff alleges that the intentional infliction of emotional distress arises out of his discharge and the defendant's conduct in the investigation leading up to it. As in *Johnson*, plaintiff alleges that the outrageous conduct of Georgia–Pacific employees and the statements allegedly made by "someone" employed by defendant caused him great humiliation and distress, and that defendant's conduct led to his discharge and subsequent humiliation and emotional distress. Not only did the court in *Johnson* find the count alleging intentional infliction of emotional distress depended substantially upon construing the collective bargaining agreement's terms, and was thereby pre-empted, but the court also found that the libel allegation relating to the false accusations about Johnson, seen internally by defendant employees directly related to the circumstances surrounding Johnson's discharge from employment "because the false accusations served as the basis for the conclusion that plant rules numbers six and seven were violated." *Id.* at 624. The court found that "any judicial resolution of this libel allegation would necessarily involve construction of the collective bargaining agreement to determine whether Mr. Johnson was wrongfully discharged," and that the allegation was "inextricably intertwined" with consideration of the terms of the collective bargaining agreement. *Id.*

To determine the merits of plaintiff's allegation would require this Court to decide whether plaintiff's discharge was warranted under the terms of the collective bargaining agreement, which depends substantially upon construing the collective bargaining agreement's terms. Such determination has already been determined, in plaintiff's favor, by the arbitrator. The fact that plaintiff also contends he heard that some of defendant's employees were telling others he was terminated for stealing, thereby causing him emotional distress does not, in this Court's opinion, take this case out of the purview of the preemption doctrine, since plaintiff is essentially challenging defendant's justification in terminating him and the method by which they determined he should be terminated. A careful review of plaintiff's statement of facts reinforces this Court's opinion that plaintiff's arguments relate to question of whether plaintiff was properly terminated, and that such determination would involve an interpretation of the collective bargaining agreement. The Court would therefore find, if necessary, that plaintiff's claim is pre-empted by the LMRA.

7. *Exclusive Remedy*—The Court sees no reason to reach defendant's remaining argument relating to whether the Arkansas Workers' Compensation Act provides the exclusive remedy in this case.

### Conclusion

Based upon the foregoing, the Court hereby grants defendant's Motion for Summary Judgment for the reasons stated herein, and orders that plaintiff's complaint be, and it is hereby, dismissed with prejudice.

IT IS SO ORDERED.