# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00620-COA

**DANIEL H. FRANK**                                                                 **APPELLANT**

**v.**

**CITY OF FLOWOOD, MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2015 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT NICHOLAS NORRIS |
| | LOUIS H. WATSON JR. |
| ATTORNEYS FOR APPELLEE: | GARY E. FRIEDMAN |
| | JASON THOMAS MARSH |
| | HOWARD DAVID CLARK III |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT GRANTED IN FAVOR OF APPELLEE |
| DISPOSITION: | AFFIRMED - 04/19/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., FAIR AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Daniel Frank alleges that he was forced to resign from his position as a police officer for the City of Flowood, Mississippi, because he refused to drop charges against Melissa Laseter for driving under the influence (DUI) and assault on a law enforcement officer. Frank argues that his constructive termination was wrongful and actionable under the *McArn* exceptions to the employment at will doctrine. *McArn v. Allied Bruce-Terminix Co.*, 626 So. 2d 603, 607 (Miss. 1993). The City maintains that Frank was due to be terminated because he acted unprofessionally and used excessive force while booking Laseter. More important

for purposes of this appeal, the City argues that Frank's claim does not fit within the *McArn* exceptions because Frank does not allege that he refused to participate in illegal activity or that he reported any illegal activity by his employer. *See id.* The Rankin County Circuit Court found that there was a genuine dispute of fact as to whether the City's stated reason for recommending Frank's termination was a pretext. Despite that factual dispute, the circuit judge concluded that Frank failed to state a claim under *McArn*. Accordingly, the circuit judge granted summary judgment in favor of the City. For the reasons discussed below, we conclude that the circuit judge correctly applied the law and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In 2009, Frank was hired as a patrolman in the traffic division of the City's police department. He later worked as a motorcycle officer in the traffic division. Frank had approximately twenty-five years of prior law enforcement experience, having worked as a law enforcement specialist in the U.S. Air Force; a sergeant with the Greenville, Mississippi police department; a detective with the Dodge City, Kansas police department; and as a contractor training police officers in Afghanistan.

¶3. On April 4, 2011, Frank responded to an accident in the Ichiban parking lot involving Dr. Jeffrey Laseter, Melissa Laseter's husband. Frank suspected that Dr. Laseter had been drinking and asked him to perform several field sobriety tests, which Dr. Laseter failed. Frank arrested Dr. Laseter on suspicion of DUI.

¶4. Frank claims that Flowood Police Chief Johnny DeWitt subsequently asked him to

2

drop the DUI charge because Dr. Laseter was assisting with some sort of "kick-back investigation." Frank agreed to drop the charge. Frank testified that he later asked some of his coworkers about the investigation, but they knew nothing of it, which Frank thought was "kind of odd for a small department."

¶5.     Chief DeWitt did "not recall ever asking [Frank] to drop the charges" against Dr. Laseter. DeWitt testified that he remembered that particular arrest only because he later discussed it with Dr. Laseter's attorney, Don Leland. DeWitt recalled that Leland claimed that Dr. Laseter and some other doctors were "being done wrong."

¶6.     A little over a year later, around 5 p.m. on April 24, 2012, Frank responded to a report of a two-car accident on Lakeland Drive. Dr. Laseter's wife, Melissa Laseter, was the driver of one of the vehicles.

¶7.     Laseter had crashed her car into a stand of trees on the eastbound side of Lakeland Drive. The other vehicle was in a ditch off the westbound side, and the driver was injured. Laseter admitted that she pulled out in front of the other vehicle and was at fault. The first officers on the scene believed that Laseter was drunk, and Laseter initially agreed to take a portable breathalyzer test. However, Laseter then refused to cooperate and, according to Corporal Josh Fuller, "started to become belligerent and began to tell [the officers about] all the people she was connected to and that [the officers] would not have jobs." Based on his "training and experience," "[Fuller] believed [Laseter] to be on some kind of stimulant."

¶8.     When Frank arrived at the scene, Laseter "was outside her car and very agitated."

3

Frank agreed with the other officers that Laseter smelled of alcohol and appeared drunk. Laseter also had a German shepherd with her outside the car and was "giving it orders in German." The dog "was an issue" because it was "getting pretty upset" and "barking." The officers instructed Laseter to put her dog inside the car or else they would have to call animal control. Laseter refused and "tried to walk off."

¶9.     When Laseter tried to walk off, Frank informed her that she was under arrest for suspicion of DUI. Laseter then "swung at [Frank]," and her wedding ring struck his hand and drew blood. Officer Aaron Thomas observed the incident and believed that Laseter had attempted to hit Frank in the face. Laseter continued to struggle, but Frank put her on the ground and handcuffed her. Eventually, Frank was able to move Laseter into the back of a patrol car. Once inside the car, Laseter began kicking at its windows. Corporal Don McBee transported Laseter to the police station, while Frank separately returned to the station on his motorcycle.

¶10.    Laseter's belligerence continued at the police station. Even before Frank arrived, Laseter was screaming profanities at the other officers and insulting their intelligence, while refusing to remain seated, storming around the room, and "staring down" the officers. Corporal McBee was unable to read Laseter her *Miranda*[1] rights because she repeatedly interrupted him.

¶11.    According to Corporal McBee, when Frank arrived, "Laseter asked [McBee] if she

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

knew [Frank]," as "Laseter did not realize that . . . Frank was the [officer] who arrested her." When McBee reminded Laseter who Frank was, her anger only increased. According to Officer Ashton French, Laseter began saying that Frank's son had overdosed on drugs and that "she knew all about it because her husband" had told her. Frank told her "that she didn't know what she was talking about and . . . needed to shut up." Frank also admitted that "at one point [he] called [Laseter] a moron because she was getting on [his] nerves."

¶12. While Frank attempted to complete the paperwork necessary to book Laseter and to obtain a warrant for a blood test, Laseter continued to be disruptive and kept up "her verbal abuse of everyone present." She refused the repeated instructions of Frank and another officer to sit on a bench. Instead, she continued to walk around the booking room and approach Frank. At some point, Laseter sat down in a chair next to Frank and refused his repeated instructions to return to the booking bench. Frank decided that he needed to move Laseter and handcuff her to the bench given that she had already assaulted him once.

¶13. Frank testified that when he took Laseter by the arm, she "went limp and started pitching a fit . . . screaming like a little three year old throwing a tantrum." When French heard this commotion, she turned around and "saw Laseter on the floor in front of the bench flaring and flapping around" while "Frank had her by the arm trying to put her on the bench." French attempted to assist Frank, but Laseter continued to scream and resist both of them. Finally, Frank and French were able to handcuff Laseter to the bench. French stated that "[t]his infuriated Laseter even further" and that Laseter "continued to verbally attack" the

5

officers. Later in the booking process, French removed Laseter's handcuffs. However, Laseter then attempted to walk out of the booking room, so French had to handcuff her again, which Laseter resisted again. Although French did not see how Laseter ended up on the floor, she stated that she did not believe that any of the officers involved "were out of line or not justified in any of [their] actions" at any point in the process.

¶14. Frank left the station at some point to obtain a judge's signature on the warrant for a blood sample from Laseter. Officer French transported Laseter to River Oaks Hospital for the test, and Frank met French and Laseter there with the signed warrant. At the hospital, Laseter continued to disobey the officers' instructions, requiring French to "pull" her through the hospital by her handcuffs. Laseter also continued screaming profanities at the officers. The results of Laseter's blood test later confirmed that she was legally intoxicated, with a blood alcohol concentration of .21 percent. After her blood sample was drawn, French transported Laseter to the Rankin County jail.

¶15. Frank testified that Chief DeWitt came to the police station that evening, which Frank said was unusual since DeWitt was not on duty. DeWitt approached Frank and began asking specific questions about Laseter, which Frank also considered unusual. DeWitt testified that the sheriff had called him to ask why Laseter had been arrested. DeWitt did not know why the sheriff called him or how he knew about the arrest. DeWitt testified that such inquiries are "common" and that, after he talked to Frank, he simply informed the sheriff that Laseter was arrested for DUI and assault on an officer and was taken to the Rankin County jail.

6

¶16.   Laseter was charged with DUI, simple assault on a law enforcement officer, resisting arrest, disorderly conduct, and possession of a Schedule II controlled substance.[2]  She was released the next day on bond.

¶17.   Frank testified that two or three days after Laseter's arrest, Chief DeWitt asked him about Laseter again.  Frank testified that the conversation occurred before he received the results of Laseter's blood test and that DeWitt "seemed to [be] trying to make an excuse for . . . Laseter."  According to Frank, DeWitt suggested that Laseter was not drunk but had "been taking Ambien."  Frank responded by saying something to the effect that if that was the case, Laseter "probably shouldn't have been driving," and that was "pretty much the end of the conversation."  DeWitt did not recall this specific conversation, but he did "recall at some point somebody giving [him] information that [Laseter] took heavy doses of Ambien," and that her actions might have been the result of Ambien rather than alcohol.

¶18.   Frank testified that several days later Chief DeWitt stated that he had "pulled [Frank's] arrest records" and that Frank had "charged more people with assault on a police officer than anybody in the department."  Frank responded that the law was intended to protect officers and should be enforced.  Based on his conversations with DeWitt—together with DeWitt's prior request that he drop charges against Dr. Laseter—Frank inferred that

---

[2] Officer Thomas had noticed an unmarked pill bottle on the passenger side of Laseter's vehicle.  Thomas called poison control and learned that the pills were Vyvanase, a Schedule II controlled substance used to treat ADHD.  Laseter later provided her son's prescription for the drug.

DeWitt wanted him to drop charges against Melissa Laseter. However, Frank did not do so.

¶19.     Lasseter's attorney, Don Leland, subsequently suggested that Chief DeWitt should look into Laseter's arrest and booking because Frank had been "heavy handed with her." DeWitt and Captain David Gammill then reviewed video footage of Laseter's booking. Having watched the video, DeWitt testified that Laseter "rank[ed] . . . as one of the most obnoxious drunks [he had] ever seen on video or ha[d] to deal with [him]self." Nonetheless, DeWitt also believed that Frank had used excessive force. Therefore, on May 7, 2012, he instructed Lieutenant Ricky McMillan to conduct an internal investigation into the incident. Frank was placed on administrative leave pending the outcome of the investigation.

¶20.     Lieutenant McMillan reviewed the video of Laseter's booking and obtained written statements from Frank and at least six other officers who witnessed the arrest and/or booking. The written statements and McMillan's report were attached as exhibits to the City's motion for summary judgment. McMillan found that the charge of simple assault on a police officer was "a good charge." However, McMillan also concluded that Frank used excessive force during Laseter's booking. McMillan found that Frank "had every opportunity to deescalate the situation" but "belittled" Laseter instead. McMillan's report states that the video shows Frank "sling[ing] [Laseter] out of her chair and into the floor and . . . drag[ging] her by her arm over to the bench."[3] According to McMillan, Frank's actions were not justified because

---

[3] Frank's brief on appeal includes a "Dropbox" link to the video, but the link is no longer active. There is some indication that the video was provided to the circuit judge, but it was not made a part of the record in the circuit court or the record on appeal.

Laseter "calmly approached" him and "did not exhibit any threatening behavior." McMillan "recognize[d] and commend[ed]" three other officers for their exemplary handling of the situation, including "above all Officer Ashton French."

¶21. Lieutenant McMillan's report recommended that Frank should be terminated "based sole[ly] on [his] actions in booking" Laseter—i.e., that he "belittled" her and used "excessive force." After completing his report, McMillan warned Frank that he would be terminated. Frank testified that this was the first time he had been accused of using excessive force as a member of the City's police department. Nonetheless, on May 14, 2012, Frank decided to resign rather than be fired. In his deposition, Chief DeWitt confirmed that Frank would have been terminated had he not resigned.

¶22. Laseter was later convicted of DUI, resisting arrest, and disorderly conduct. The charges of simple assault on a law enforcement officer and possession of a controlled substance were remanded to the district attorney's files.

¶23. On September 18, 2012, Frank filed a complaint against the City of Flowood for wrongful termination.[4] In his complaint, Frank alleged that he was forced to resign in retaliation for his refusal to drop charges against Laseter.

¶24. On January 30, 2015, the City moved for summary judgment. The City primarily

---

[4] Frank's complaint also named Laseter as a defendant and asserted a claim for tortious interference with contract or business relations and a claim under 42 U.S.C. § 1985. After the City removed the case to federal court, Frank voluntarily dismissed Laseter and these two claims, and the federal court eventually remanded the case to the circuit court.

argued that Mississippi recognizes only two narrow "public policy" exceptions to the rule of employment at will: an employee may not be terminated for refusing to engage in criminally punishable acts or for reporting his employer's criminally punishable acts. The City argued that Frank's wrongful termination claim failed as a matter of law because he could not show that he was forced to resign for either reason.

¶25. At a hearing on the City's motion, the circuit court judge concluded "that a question of fact exists as to whether [Frank] . . . was terminated for excessive use of force or whether that was a pretext to get rid of [him] because he would not drop criminal charges against [Laseter]." However, the circuit judge concluded that even if Frank was forced to resign because he would not drop charges against Laseter, his claim did not fit within either of the *McArn* exceptions to the doctrine of employment at will. Accordingly, the circuit judge granted the City's motion for summary judgment. Frank filed a timely notice of appeal.

## DISCUSSION

¶26. We review the grant or denial of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Buchanan v. Ameristar Casino Vicksburg Inc.*, 852 So. 2d 25, 26 (¶3) (Miss. 2003) (citing *Williamson ex rel. Williamson v. Keith*, 786 So. 2d 390, 393 (¶10) (Miss. 2001)). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). "Otherwise, the

10

motion should be denied." *Buchanan*, 852 So. 2d at 26 (¶3) (quoting *Williamson*, 786 So. 2d at 393 (¶10)).

¶27. "In Mississippi—when there is no written employment contract—the employment relationship is at-will, which means that 'an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible.'" *Galle v. Isle of Capri Casinos Inc.*, 180 So. 3d 619, 622 (¶13) (Miss. 2015) (quoting *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 986 (¶46) (Miss. 2004)). To date, the Mississippi Supreme Court has recognized only two "limited . . . public policy exceptions to the age old common law rule of employment at will":

> (1) an employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*McArn*, 626 So. 2d at 607. The former exception is intended to "protect[] an employee from being forced to choose between committing a crime and losing his . . . job." *Galle*, 180 So. 3d at 623 (¶15) (quoting *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 667 (Colo. 1999)). The latter exception "is based on an employer's duty not to thwart the public interest by terminating employees for speaking the truth." *Cmty. Care Ctr. of Aberdeen v. Barrentine*, 160 So. 3d 216, 220 (¶14) (Miss. 2015) (citing *McArn*, 626 So. 2d at 607).

¶28. However, *McArn* does not protect "speaking the truth" on any and all subjects. The whistleblower exception applies only if "the acts complained of [by the employee] warrant

11

the imposition of criminal penalties, as opposed to mere civil penalties." *Hammons v. Fleetwood Homes of Miss. Inc.*, 907 So. 2d 357, 360 (¶11) (Miss. Ct. App. 2004). And to date, the Supreme Court has applied the exception only when an employee reports criminal activity of his employer or a co-employee. *See DeCarlo v. Bonus Stores Inc.*, 989 So. 2d 351, 356-57 (¶¶15-18) (Miss. 2008). *DeCarlo* does seem to make clear that an employee may not be terminated in retaliation for reporting the illegal acts of a co-employee, even if those acts are harmful only to the employer's business and do not directly harm third parties. *See id.* However, neither *DeCarlo* nor any other case holds that public policy forbids an employer from terminating an at-will employee for reporting the allegedly illegal acts of someone other than the employer or its employees.

¶29. This brings us to Frank's case. Frank concedes that the first *McArn* exception does not apply because he was not asked to participate in any illegal activity. Instead, he argues that the second *McArn* exception should be expanded to protect an employee who reports criminal activity related to his employer's business, even if the crime is committed by a non-employee third party. Frank's argument is not an unreasonable one. In *DeCarlo*, the Supreme Court held that an at-will employee is protected from retaliation for reporting "purported illegal activity [of a co-employee] which unquestionably would have a harmful effect on the employer's business, i.e., loss of corporate income." *DeCarlo*, 989 So. 2d at 357 (¶17). The illegal activity that Frank reported "unquestionably would have a harmful effect" on the City of Flowood and its citizens. In addition, it is difficult to argue with the

12

abstract proposition that a police officer should not be "fired . . . for fulfilling his duties as a law enforcement officer." *City of Green Forest v. Morse*, 873 S.W.2d 155, 159 (Ark. 1994) (Brown, J., dissenting); *but see id.* at 547-48 (majority op.) (explaining that an officer may be fired if he attempts to fulfill his duties by driving a police car at an unsafe speed and endangering lives in pursuit of a misdemeanant).

¶30. Furthermore, we are not persuaded by the City's reliance on *Buchanan*, which reaffirmed longstanding precedent that there is no "public policy exception" for "an employee who may have been discharged for filing a workers' compensation claim." *Buchanan*, 852 So. 2d at 26 (¶4) (citing *Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874, 877 (Miss. 1981)). The City argues that the Supreme Court's rejection of such an exception suggests that it would not recognize an exception in this case either. However, the Court declined to recognize an exception in *Kelly* only because the Legislature had enacted a comprehensive workers' compensation scheme but did not create a cause of action for retaliatory discharge. *Kelly*, 397 So. 2d at 876. The Court reasoned that judicial creation of such a "remedy . . . would . . . engraft on the [workers' compensation] law an exception different from that expressed by the Legislature." *Id.* Therefore, although the Court acknowledged that the plaintiff's arguments had "considerable appeal," "the merits of his arguments [were] clearly for the Legislature to assess, not the judiciary." *Id.* The Court's ruling rested squarely on the constitutional separation of powers and the judiciary's duty to interpret and apply the law as it is written. *Id.* at 877; *accord Swindol v. Aurora Flight Scis.*

13

*Corp.*, No. 2015-FC-01317-SCT, 2016 WL 1165448, at \*3 (¶¶6-7) (Miss. Mar. 24, 2016). Such considerations carry less weight when the issue is simply whether to recognize a common law exception to a common-law rule. *See Swindol*, 2016 WL 1165448, at \*4 (¶10) (citing *Laws v. Aetna Fin. Co.*, 667 F. Supp. 342, 345 (N.D. Miss. 1987)).

¶31.    Nonetheless, Frank has not cited, nor have we found, any persuasive authority recognizing a claim for wrongful termination in comparable circumstances. Moreover, there is a potential concern that if we recognized such a claim, "virtually every personnel decision or disciplinary action[] taken by the employers of law enforcement personnel could be the basis of a wrongful discharge suit." *Broad v. Wilt*, 42 Va. Cir. 74, 1997 WL 33573694 (Va. Cir. Ct., Rockingham Cty. Feb. 21, 1997) (refusing to recognize a public policy exception to the doctrine of employment at will in the case of an officer allegedly terminated for writing traffic tickets against "prominent citizens"). The U.S. Supreme Court cited similar concerns in its ruling that the First Amendment was not implicated by a deputy district attorney's claim that he was fired in retaliation for authoring a memorandum that recommended the dismissal of criminal charges on the basis of alleged police misconduct. *See Garcetti v. Ceballos*, 547 U.S. 410, 413-15, 420-24 (2008). The *Garcetti* Court reasoned that extending constitutional protection to statements that a public employee makes pursuant to his official duties "would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business." *Id.* at 423.

¶32. This case, of course, deals with Mississippi common law, not the U.S. Constitution. But Frank's claim arguably raises similar concerns. Recognition of such a claim would require some measure of judicial oversight of law enforcement agencies' personnel decisions. It would put courts in the role of judging whether an agency terminated an officer because he was overzealous or demonstrated poor judgment or simply because, as Frank alleges in this case, he upheld the law and refused to drop valid charges. This would be a significant expansion of the current *McArn* exceptions, which are narrowly limited to cases in which an employee refuses to participate in criminal activity or, as a "whistleblower," reports his employer's or a fellow employee's criminal activity. Our Supreme Court recently reiterated the longstanding rule that "[a]bsent the narrow public-policy exceptions announced in *McArn* or prohibitions contained in federal or state law, an employer may fire an at-will employee for any reason or no reason at all." *Swindol*, 2016 WL 1165448, at *5 (¶15) (quoting *Galle*, 180 So. 3d at 623 (¶18)) (emphasis omitted). Based on this settled rule, we decline Frank's request to expand *McArn* to the facts of this case.

## CONCLUSION

¶33. The circuit court correctly held that Frank's wrongful termination claim does not fit within either of the *McArn* exceptions to the common law rule of employment at will. We therefore affirm the circuit court's order granting summary judgment in favor of the City.

¶34. **THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**